

Opinions of the United
States Court of Appeals
for the Third Circuit

2008 Decisions

4-14-2008

# Chainey v. Street

Precedential or Non-Precedential: Precedential

Docket No. 06-1061

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Chainey v. Street" (2008). *2008 Decisions.* Paper 1295.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1295

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

Nos. 06-1061 & 06-1256

————————

NANNIE CHAINEY;
LEROY HAMPTON, JR.; ERNESTINE M. RICE;
TRINA McCLAIN; LYNNE JOHNSON;
TERESA A. GRAYER-CAMPBELL;
CASSANDRA CARTER JOHNSTON;
THOMAS MAPP SR.; BETTY MAPP H/W;
BETTY MAPP1; ERNEST HUBBARD;
ESTHER HUBBARD H/W; ESTHER HUBBARD1;
ROBERT FORD; GWENDOLYN FORD H/W;
GWENDOLYN FORD1; OLAITAN ODENIYI;
ADEOLA ODENIYI H/W; ADEOLA ODENIYI1;
LUCRETIA WILSON; ANNE LEE;
GERALD RENFROW; CONSTANCE RENFROW H/W;
VIRGINIA COX; HAZEL TAYLOR;
MILTON WILLIAMS; SHERRY WILLIAMS H/W;
FRANK LEWIS; EVA LEWIS H/W; EVA LEWIS1;
KERMIT BOSTIC; ELIZABETH BOSTIC H/W;
MARY J. JACKSON; SAMUEL MATTAWAY;
YVETTE MATTAWAY H/W; YVETTE MATTAWAY1;
CHARLES RENFROW, JR.; GERALD RENFROW1;

CARRIE F. FOSKEY; BERIDAN PAYNE;
CONSTANCE RENFROW1,

> Appellees at 06-1061/
> Cross-Appellants at 06-1256

v.

JOHN STREET, MAYOR, CITY OF PHILADELPHIA;
CITY OF PHILADELPHIA;
EDWARD McLAUGHLIN, COMMISSIONER,
DEPARTMENT OF LICENSES AND INSPECTIONS;
HERBERT E. WETZEL, EXECUTIVE DIRECTOR;
REDEVELOPMENT AUTHORITY
OF THE CITY OF PHILADELPHIA,

> Appellants at 06-1061/
> Cross-Appellees at 06-1256

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 03-cv-06248
(Honorable John P. Fullam)

Argued January 23, 2007

Before:  SCIRICA, *Chief Judge*,
FUENTES and CHAGARES, *Circuit Judges*

2

(Filed April 14, 2008 )

CRAIG R. GOTTLIEB, ESQUIRE (ARGUED)
RICHARD G. FEDER, ESQUIRE
City of Philadelphia Law Department
One Parkway, 17th Floor
1515 Arch Street
Philadelphia, Pennsylvania 19102
        Attorney for Appellants/Cross-Appellees

ROBERT T. VANCE, JR., ESQUIRE (ARGUED)
100 South Broad Street, Suite 1530
Philadelphia, Pennsylvania 19110

ADRIAN J. MOODY, ESQUIRE
Law Offices of Adrian J. Moody
1616 Walnut Street, Suite 700
Philadelphia, Pennsylvania 19103
        Attorney for Appellees/Cross-Appellants

_____

OPINION OF THE COURT

_____

SCIRICA, *Chief Judge*.

        This is an appeal from the District Court's partial denial
of defendants' post-trial motion after a jury verdict against the

3

City of Philadelphia based on its decision to halt repairs on houses rebuilt in the aftermath of the 1985 MOVE bombing. Defendants are the city, the city Redevelopment Authority, and three former city officials: Mayor John Street, former Licenses and Inspections Commissioner Edward McLaughlin, and Redevelopment Authority Executive Director Herbert Wetzel. Plaintiffs are twenty-four of the sixty-one homeowners whose houses were destroyed in a fire caused by the MOVE bombing. In 1986, the city agreed to rebuild plaintiffs' houses and to repair defects for up to ten years. After having spent $12.8 million over 14 years, the city decided in July 2000 it would make no further repairs to the houses. A federal jury rendered a partial verdict for plaintiffs. Defendants filed post-trial motions, which the District Court granted in part, reducing the jury award. Both parties appealed. We will affirm in part and reverse in part. We will remand for an analysis of the substantive due process claim and Fed. R. Civ. P. 50 waiver and, if the issue has not been waived, for a determination of whether each plaintiff proved causation and damages.

## I.

This case arises from the city's 1985 bombing during the administration of Mayor Wilson Goode (mayoral term 1984–1992) of a home occupied by MOVE, a group formed in the 1970s as part of a "back to nature" movement. In 1978, the city attempted to execute an eviction order on MOVE members living in a home in the Powelton Village neighborhood of Philadelphia. MOVE members resisted with gunfire, killing one

4

police officer and wounding other officers and firefighters. Nine MOVE members were convicted and sentenced for the officer's murder.

By 1985, at least thirteen MOVE members had relocated to a single family home at 6221 Osage Avenue in West Philadelphia. Disrupting the neighborhood with loudspeakers, MOVE members made violent and profane threats to neighbors, police, and city officials. According to a police probable cause affidavit submitted to support arrest and search warrants, MOVE members carried weapons, blocked the windows of their house with wooden slats, constructed a bunker on the roof, and threatened to blow up the entire neighborhood. Arrest and search warrants were issued on May 11, 1985. On May 12, the police evacuated residents from the surrounding neighborhood, anticipating a raid on the MOVE house.

In the early morning of May 13, police officers and firefighters surrounded the MOVE residence. At 5:30 a.m., with a bullhorn, police announced they had arrest warrants for four MOVE members and gave them fifteen minutes to surrender. The MOVE members resisted, shouting back threats that they were prepared for a gun battle. After fifteen minutes, police fired tear gas and smoke projectiles at the house. Firefighters sprayed the house with water to provide cover for advancing police officers. Some minutes later, the police came under fire from gunshots fired from inside the house. Muzzle flashes were seen coming from the rooftop bunker.

A massive gun battle ensued. Police were unable to enter the house because the walls of the house were fortified. Police retreated, and considered other methods to breach the defenses MOVE had erected. Later that afternoon, a police helicopter dropped a bomb on the roof of the MOVE residence. The bomb's detonation ignited several barrels of gasoline, starting a fire that killed eleven of the thirteen residents. Houses on the Pine and Osage blocks were consumed in the blaze. The bombing, the resultant deaths, and the destruction of neighbors' homes were viewed as a national tragedy.

This case involves the owners of houses on the Pine and Osage blocks. In the fire's aftermath, the city engaged in extensive negotiations with the owners of the sixty-one destroyed houses. In June 1985, the city asked the Redevelopment Authority to use its eminent domain authority to acquire the damaged area for "develop[ment] as a redevelopment project." The homeowners filed objections to the eminent domain/redevelopment plan. In April 1986, the Philadelphia City Council enacted Ordinance 861, obligating the city to rebuild the sixty-one houses "destroyed in the conflagration." The city also agreed to provide a ten-year warranty for certain defects from the day each homeowner moved into his/her home.

In September 1986, the parties entered into an agreement (the 1986 Agreement), in which the city agreed to build and warrant sixty-one new houses in compliance with all applicable Philadelphia Codes, as required by Ordinance 861, and plaintiffs

agreed to waive damages claims in the eminent domain proceeding. The city enlisted the Redevelopment Authority, which selected a developer, Edwards & Harper, a corporation specifically formed to rebuild the houses. The city allocated $6.7 million to Edwards & Harper through the Urban Local Development Corporation to finance the rebuilding project. Edwards & Harper hired a general contractor, Ebony Construction Company, Inc., of which Ernest Edwards was a director.

Edwards misappropriated funds and was prosecuted and convicted of theft. *See Commonwealth v. Edwards*, 582 A.2d 1078, 1082–90 (Pa. Super. Ct. 1990). Edwards & Harper failed to complete the project. The city and the Redevelopment Authority hired another general contractor to complete the houses. In February 1986, when Edwards's companies defaulted, the new general contractor was left with over one million dollars of unpaid costs.

For two years, plaintiffs lived in substitute housing at the city's expense. In 1987, plaintiffs moved into their newly constructed homes. But the houses were defective. Within weeks of moving in, several homeowners experienced problems including: leaking roofs, defective bathroom and kitchen plumbing, improper or inadequate flooring, nails popping out of walls, bursting pipes, defective electrical wiring, flooded basements and backyards, and non-functioning appliances. In June 1987, the city amended Ordinance 861 to authorize the city to hire the Redevelopment Authority to warrant the houses

7

against "construction, design and related defects." In January 1988, the city and the Redevelopment Authority entered into a new agreement (the 1988 Agreement)—the Redevelopment Authority agreed to perform the city's repair obligations and the city agreed to compensate the Redevelopment Authority.

Between 1988 and 1997, when the warranties were set to expire, the Redevelopment Authority conducted piecemeal repairs of reported problems, replacing roofs, stoves, dishwashers, and garbage disposals. The record suggests a continuous flow of money into the project, but does not present a clear picture of the total expenditures during that time.[1] In 1995, the Redevelopment Authority estimated it would cost $8.5 million to repair the original defective construction.

The city and the Redevelopment Authority hired the United States Army Corps of Engineers to evaluate the cost of the remaining repairs. In 1997, the Corps issued a comprehensive report outlining the remaining necessary repairs, estimating it would cost the city and the Redevelopment Authority $1.657 million to fulfill their warranty obligations and to bring each house into compliance with city building codes. The Corps determined that repairs to the building envelope—the roofing, bricks, sliding doors, siding, and windows—would account for seventy percent of the total projected remaining cost.

_____

[1]Between 1988 and 1990, the city allocated $720,400 to the Redevelopment Authority for repairs.

In 1998, the city, the Redevelopment Authority, and the Corps designed a solicitation for bids from private contractors to complete the repair work. On August 30, the Redevelopment Authority entered into a $1,765,538 contract with the successful bidder, Allied Construction Company (the Redevelopment Authority-Allied Construction Agreement). The city allocated $2 million to pay Allied Construction for the repairs. Shortly thereafter, Allied Construction workers uncovered several other problems hidden from view until discovered in the course of conducting repairs. The Redevelopment Authority subsequently authorized payment of an additional $800,000. But by the end of 1999, the estimated cost for modifications rose from $800,000 to between $2.1 million and $3.5 million, an increase attributable to items not covered under the work's original scope: changed window types, brick wall modifications and window sill replacements, additional framing, and modifications to interior walls.[2] None of these additional costs had been included in Allied Construction's original estimate.

---

[2]The total hard construction-cost estimates increased to between $3.3 million and $4.4 million (including the original $1.7 million). Additional costs included $439,000 to $482,000 in soft costs for the United States Army Corps of Engineers contract, an energy consultant contract, and Redevelopment Authority staff, and $416,000 to $556,000 for warranty settlement items including interior repairs to be made by homeowners, lost energy payments, and owners' administrative fees.

9

Accordingly, the Redevelopment Authority requested another $2.9 million from the city to satisfy Allied Construction's requests and to comply with the warranty obligations.

On December 22, 1999, outgoing Mayor Edward Rendell sent a letter (the Rendell Letter) to the homeowners reaffirming the city's intent to complete the necessary repairs. But after Mayor John Street took office in January 2000, city officials balked at the Redevelopment Authority's request for the additional $2.9 million. In a memorandum dated January 4, 2000, the city audit manager estimated the final cost of each warranty at $129,000 for each of the sixty-one houses, for a total cost of $7,869,000. On February 10, 2000, the city controller reported that the city had already incurred almost $13 million for warranty repairs, or $211,286 per house. In March 2000, the city estimated the additional cost would range between $4.5 million and $11 million. In the 1986 Agreement, the city determined the fair-market value of the houses as of May 12, 1985, to be approximately $26,000 per house, or $1,586,000 total. At trial, Plaintiffs' expert report estimated that as of March 23, 2005, plaintiffs would need to be reimbursed "in the neighborhood of $250,000" for each house in order to relocate to a similar house in another Philadelphia neighborhood.

In mid-2000, the city's Department of Licenses and Inspections inspected the houses and reported that no defects rendered the houses imminently dangerous. But the report noted a problem with air vents—an original construction defect that could potentially draw carbon monoxide into the houses. None

of the residents had reported any carbon monoxide problems, but the city's commerce director prepared a plan for relocating all of the residents. City officials soon concluded the air-vent problem rendered the houses imminently dangerous and that the houses should be treated as a blighted area. On July 21, 2000, plaintiffs were summoned to a meeting with the mayor at City Hall. At that meeting, Mayor John Street presented plaintiffs with a letter informing them that the city would pay $125,000 per house, plus $25,000 for relocation expenses, but that the parties would be required to vacate their premises no later than September 6, 2000. The residents were told that if they did not move, their homes would be taken through eminent domain. Thirty-seven of the sixty-one sets of residents accepted this (or a subsequent lower) offer; the remaining twenty-four rejected the offer, and later initiated this suit.

Shortly thereafter, Philadelphia Gas Works began to "red-tag" plaintiffs' houses, the first step in terminating gas service. Plaintiffs obtained an injunction in state court against Philadelphia Gas Works to continue service and against the city to refrain from demolishing plaintiffs' houses without a court order or until the conclusion of the eminent domain proceeding. *Coles v. Philadelphia*, No. 0395 (Philadelphia County Ct. Comm. Pl. Oct. 3, 2000) (order granting injunction).

On October 22, 2003, plaintiffs filed suit in state court and defendants removed to federal court. At a federal jury trial, plaintiffs sought to prove claims based on breach of contract, substantive due process, the takings clause, state-law conspiracy,

11

equal protection, and specific performance. On the contract claim, the jury was instructed to decide liability and damages for breach of contract on three alleged contracts: the 1988 Agreement,[3] the Redevelopment Authority-Allied Construction Agreement, and the Rendell Letter.

The jury found the city and the Redevelopment Authority liable for breach of two contracts—the 1988 Agreement and the Rendell Letter, but not the Redevelopment Authority-Allied Construction Agreement. The jury awarded $250,000 per plaintiff in contract damages, consisting of $150,000 in expectation damages against the city and the Redevelopment Authority and $100,000 in emotional distress damages against the city ($6 million total). The jury awarded $152,083.33 per plaintiff for substantive due process violations, consisting of $70,000 per plaintiff in compensatory damages against Mayor John Street, $30,000 in compensatory damages against the city, and $52,083.33 in punitive damages against Mayor John Street in his individual capacity ($3.65 million total). For the takings clause claims, the jury awarded $80,000 per plaintiff against the city ($1.92 million total). The jury also awarded $52,500 per plaintiff in conspiracy damages against defendants, consisting of $20,000 in compensatory damages against the mayor, $14,000 in compensatory damages against the city, $2,000 each in compensatory damages against Wetzel, McLaughlin, and the Redevelopment Authority, $4,166.67 in punitive damages

_____

[3]The jury instructions did not reference the 1986 Agreement.

12

against the city, and $8,333.33 in punitive damages against the mayor ($1.26 million total). The District Court entered judgment against defendants for a total of $12.816 million, with each of the twenty-four plaintiffs receiving an aggregate award of $534,000.

The case was tried before Judge Clarence Newcomer, who died after the jury verdict. Defendants filed post-trial motions. Newly assigned Judge John Fullam granted defendants' motion for judgment as a matter of law with respect to the takings, civil conspiracy, and punitive damages claims, but rejected defendants' motion for a new trial. *See Chainey v. Philadelphia*, No. Civ.A. 03-06248-JF, 2005 WL 3263042 (E.D. Pa. Dec. 1, 2005). The court upheld liability on claims for breach of contract (under both the 1988 Agreement and the Rendell Letter) and substantive due process. *Id.* at *3–4. On breach of contract, the court upheld the jury's award of $150,000 per plaintiff in repair damages ($3.6 million total) and $100,000 per plaintiff for emotional distress ($2.4 million total). *Id.* at *5–6. Although the court upheld the substantive due process verdict against the city and against Mayor John Street in his official capacity, it awarded no recovery because plaintiffs sought only emotional distress damages for this claim. *Id.* The court found an unacceptable overlap between the $2.4 million contractual emotional distress award and the identical award for substantive due process violations. *Id.* Moreover, the court found that any award in excess of $100,000 per plaintiff for emotional distress damages, caused by either breach of contract

13

or substantive due process violations, was excessive. *Id.*

Accordingly, the District Court entered judgment for breach of contract against the city and judgment for substantive due process against the city and against Mayor John Street in his official capacity. The aggregate award for each plaintiff was reduced to $250,000 for a total of $6 million.[4]

## II.

All parties have appealed. Defendants contend the District Court erred by denying judgment as a matter of law on the breach of contract claims and substantive due process claims, and by denying their motion for a new trial. Plaintiffs contend the District Court erred by overturning the takings clause verdict and the punitive damage award against Mayor John Street.

### A. Breach of Contract Claims

---

[4]Jurisdiction is proper under 28 U.S.C. § 1291. The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. We exercise plenary review over this appeal and cross-appeal from a final judgment, granting in part and denying in part defendants' post-trial motion for judgment as a matter of law. *Marinelli v. City of Erie*, 216 F.3d 354, 359 (3d Cir. 2000). We review defendants' request for a new trial based on alleged prejudicial questioning for abuse of discretion. *United States v. Adedoyin,* 369 F.3d 337, 342 (3d Cir. 2004).

The District Court declined to disturb the jury's damage award based on breach of contract under both the 1988 Agreement and the Rendell Letter. *Chainey*, 2005 WL 3263042, at *3–4. The court held defendants waived their statute of limitations defense against the contract claims based on the 1988 Agreement by failing to raise the defense until post-trial motions. *Id.* at *4. It also rejected defendants' argument that Mayor Rendell was not authorized to bind the city, concluding he had apparent authority. *Id.* at *3.

We will affirm liability under the 1988 Agreement, but not under the Rendell Letter. Accordingly, we will affirm the award of contractual expectation damages based upon the 1988 Agreement and reverse the award of contractual emotional distress damages based on the Rendell Letter.

### 1. 1988 Agreement

#### a. Statute of Limitations

Defendants contend that Pennsylvania's four-year statute of limitations for written contracts bars recovery under the 1988 Agreement. 42 Pa. Cons. Stat. § 5525(a)(8). Defendants maintain the 1988 Agreement expired no later than November 1996, requiring plaintiffs to assert their claims by November 2000. The District Court found defendants waived the statute of limitations defense by failing to timely raise it. We agree.

Affirmative defenses should be asserted in the appropriate responsive pleadings. Fed. R. Civ. P. 8(c). "Failure

15

to raise an affirmative defense by responsive pleading or by appropriate motion generally results in the waiver of that defense." *Charpentier v. Godsil*, 937 F.2d 859, 863 (3d Cir. 1991).[5] Although "a [statute of] limitations defense does not necessarily have to be raised in the answer[,] . . . it does not follow that a limitations defense can be raised at any time." *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002). In this case, it was raised too late. A statute of limitations defense, raised for the first time in a post-trial motion, is generally waived. *See Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1161 (3d Cir. 1989) (finding statute of limitations defense waived when raised in the answer but never pursued until post-trial motions); *see also United States v. Big D Enterprises, Inc.*, 184 F.3d 924, 935 (8th Cir. 1999) (finding statute of limitations defense waived when "[a]ppellants failed to raise the statute of limitations argument until their posttrial [sic] motion for remittitur").

---

[5]"The purpose of requiring the defendant to plead available affirmative defenses in his answer is to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed." *Robinson v. Johnson,* 313 F.3d 128, 134–35 (3d Cir. 2002) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971)). Permitting the limitations defense after the close of all evidence contradicts the articulated purpose of the rule.

16

Defendants first raised the statute of limitations defense to the 1988 Agreement in post-trial motions. They justify their failure to plead it earlier by contending the 1988 Agreement was never pleaded nor did it become an articulated theory of recovery until mentioned in the District Court's jury instructions. But in their Amended Complaint, plaintiffs alleged that "[d]efendants breached the express and implied terms and conditions of the Settlement Agreement, the Allied [Construction] Contract, and their other legal obligations . . . " and that "[a]s a direct and proximate result of . . . Defendants' breaches of the Settlement Agreement, Mayor Rendell's December 22, 1999 letter, the Allied [Construction] Contract and related contractual obligations, . . . Plaintiffs were injured . . . ." Although it should have been specifically pleaded, the reference to "related contractual obligations" covers the related contractual obligation in the 1988 Agreement. Furthermore, the proposed jury instructions expressly referenced the "1988 warranty agreement" as a theory of recovery. Defendants raised no objection.

In *Bradford-White Corp. v. Ernst & Whinney*, we found a statute of limitations defense waived where, even though pleaded in the answer, it was not pursued before or at the trial. 872 F.2d at 1160–61 (defendant "did not file a motion or present argument before the district court on the statute of limitations issue at any time before or at the trial"). After the jury verdict, defendant raised its statute of limitations arguments in post-trial motions. We found "it would be grossly unfair to allow a

17

plaintiff to go to the expense of trying a case only to be met by a new defense after trial." *Id.* at 1161. Defendants here never raised the statute of limitations defense to the 1988 Agreement until after trial. They have waived the statute of limitations defense.

Defendants cite *Eddy v. Virgin Islands Water & Power Auth.*, 256 F.3d 204 (3d Cir. 2001), as authority to amend at the post-trial stage. In *Eddy*, we held the defense of qualified immunity is not necessarily waived by a defendant who fails to raise it until the summary judgment stage. *Id.* at 210. *Eddy* is inapposite.

### b. The City's Liability

Defendants contend plaintiffs cannot recover against the city as a matter of law because the contractual obligations in the 1988 Agreement ran only between the Redevelopment Authority and the city. Contending only the Redevelopment Authority promised to repair plaintiffs' homes, defendants argue the Redevelopment Authority was the only party responsible to plaintiffs under the 1988 Agreement.[6] But the city assumed responsibility to repair plaintiffs' houses in the 1986 Agreement.

---

[6]Defendants cite no case law, referring instead to the Restatement (Second) of Contracts § 304, which states: "A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty."

18

It then delegated that duty to the Redevelopment Authority in the 1988 Agreement, and promised to fund the repairs. Before payment, the Redevelopment Authority was required to provide the city with bills and vouchers. Plaintiffs were third-party beneficiaries of the 1988 Agreement, and may properly assert claims based on the 1988 Agreement against both the city and the Redevelopment Authority. Accordingly, we agree with the District Court that the 1988 Agreement was a valid basis for the jury's contract award against the city.

### 2. The Rendell Letter

Defendants contend the Rendell Letter was not a binding contract because it lacked the approval of the City Law Department and Finance Department as required by the Philadelphia Home Rule Charter. *See* 351 Pa. Code § 4.4-400(c);[7] 351 Pa. Code § 6.6-104.[8] Plaintiffs presented no

---

[7] Contracts and Bonds. The [City Law] Department shall prepare or approve all contracts, bonds and other instruments in writing in which the City is concerned, and shall approve all surety bonds required to be given for the protection of the City. It shall keep a proper registry of all such contracts, bonds and instruments.

351 Pa. Code § 4.4-400(c).

[8] Contracts. Before any contract shall be effective, the [City] Director of Finance shall approve it as

19

evidence that the City Law Department or Finance Department prepared or approved the Rendell Letter. Nonetheless, plaintiffs contend defendants bore the burden and failed to put forth evidence to show the letter was not approved in accordance with the Philadelphia Home Rule Charter. Plaintiffs are incorrect. Under Pennsylvania law, the party asserting the validity of a contract bears the burden of proof. *Linn v. Employers Reins. Corp.,* 153 A.2d 483, 485 (Pa. 1959); *Hazleton Area Sch. Dist. v. Krasnoff*, 672 A.2d 858, 862 (Pa. Commw. Ct. 1996).

At issue is whether Mayor Rendell had actual or apparent authority to contract for the city, absent the approval of the City Law and Finance Departments. The Philadelphia Home Rule Charter provides: "the [City Law] Department shall prepare or approve all contracts . . . ." 351 Pa. Code § 4.4-400(c). Furthermore, "[b]efore any contract shall be effective, the [City] Director of Finance shall approve it as to the availability of appropriated funds." 351 Pa. Code § 6.6-104. Under Pennsylvania decisional law, government officials cannot bind

---

> to the availability of appropriated funds. He shall designate on every such contract, the appropriation under which it is made and shall give it a number in the order of its date. He shall, in the order in which each contract is numbered, charge the appropriation out of which expenditures thereunder will be made.

351 Pa. Code § 6.6-104.

the government without the necessary statutory approval. *See City of Scranton v. Heffler, Radetich & Saitta, LLP*, 871 A.2d 875, 880 (Pa. Commw. Ct. 2005) ("'Where a municipality must execute a contract in a particular manner under legislative pronouncement, failure to comply with the pronouncement renders the contract unenforceable.'" (quoting *Alco Parking Corp. v. Public Parking Auth. of Pittsburgh*, 706 A.2d 343, 348 (Pa. Super. Ct. 1998))); *Pittsburgh Baseball, Inc. v. Stadium Auth. of Pittsburgh*, 630 A.2d 505, 508–09 (Pa. Commw. Ct. 1993) (finding an oral contract with a city mayor was not binding on the city); *see also Innes v. Sch. Dist. of Nanticoke*, 20 A.2d 225, 227 (Pa. 1941) ("'Persons contracting with a governmental agency must, at their peril, know the extent of the power of its officers making the contract.'" (quoting *Charleroi Lumber Co. v. Sch. Dist. of Bentleyville*, 6 A.2d 88, 92 (Pa. 1939))).

In *Scranton*, the Commonwealth Court considered whether the City of Scranton could be liable for the mayor's written promise to pay plaintiff to audit medical claims paid by the city's insurance carrier. After plaintiff submitted invoices for several months of auditing services, the city refused to pay. Finding the statutory requirements for execution of municipal contracts mandatory, the court held there was no legally binding contract. *Scranton*, 871 A.2d at 880. The City of Scranton's Administrative Code provided "all contracts must be reviewed and approved by the City Solicitor and signed by the Mayor and the Controller or their designated substitutes and attested to by

the City Clerk." *Id*. Because these requirements had not been met, the court found no valid contract. *Id.*

Similarly in *Pittsburgh Baseball, Inc.,* plaintiff was attempting to enforce an alleged oral promise by the mayor of the City of Pittsburgh to contribute $25 million towards the purchase and operation of the Pittsburgh Pirates baseball franchise. The Commonwealth Court held the alleged oral contract with the mayor was not binding on the city where the relevant city code required all contracts with the city to be in writing and to be signed by the mayor and appropriate department head and where the Philadelphia Home Rule Charter required that all contracts involving city affairs be authorized by resolution of the city council. *Pittsburgh Baseball, Inc.*, 630 A.2d at 508–09. Construing the plain language of the statute, the Philadelphia Home Rule Charter, and Pennsylvania decisional law, we find the Rendell letter lacked actual authority to bind the city.

Even if lacking actual authority, the District Court held the mayor had apparent authority to bind the city: "[It] may well be [that the mayor lacked actual authority], but he certainly had apparent authority . . . ." *Chainey*, 2005 WL 3263042, at *3. To establish apparent authority, a third party must demonstrate that he reasonably relied on his agent's alleged appearance of authority. *Revere Press, Inc. v. Blumberg*, 246 A.2d 407, 410 (Pa. 1968). Citing *William B. Tanner Co., Inc. v. WIOO, Inc.*, 528 F.2d 262, 268 (3d Cir. 1975), plaintiffs assert they reasonably believed the mayor, as the city's chief executive, had

22

the power to contractually bind the city. In *Tanner*, an agent of a radio station who held himself out as a general manager entered into contracts on behalf of the radio station. We held that a reasonable person might believe the radio station gave the agent authority. *Id.* at 266–67. But that case did not involve apparent authority where a statute, ordinance, or in this case, a statute and a city home rule charter dictated the approval necessary to bind the city.

Where a statute gives public notice of the required procedures for governmental contract approval, Pennsylvania courts have held there is no apparent authority for contracting government agents who are not authorized by the statute. *See Berkheimer Associates v. Norco Motors,* 842 A.2d 966, 970–71 (Pa. Commw. Ct. 2004); *Krasnoff,* 672 A.2d at 862. In *Norco,* the Commonwealth Court refused to enforce a settlement agreement between a local tax collector and a taxpayer over township and school district delinquent taxes because it was not approved by a majority vote of the school board, as required by the Public School Code for contracts exceeding $100. The taxpayer contended the tax collector had apparent authority to settle, citing case law holding that a lawyer may sometimes have apparent authority to settle a case on behalf of the client even absent express authority. *Norco,* 842 A.2d at 969–70. In rejecting this argument, the court found, "the cases relied on by Norco and the trial court do not involve a school district where a statute puts all persons dealing with it on notice that contracts over $100.00 require approval of the school board." *Id.* at 970.

23

Similarly in *Krasnoff*, the Commonwealth Court rejected the argument that school board members had apparent authority to contract absent approval by a majority vote of the school board. In *Krasnoff*, an architect contracted with the school district to perform renovations. After meeting with individual school board members, the architect provided services beyond the scope of his original contract. The Commonwealth Court determined the Public School Code required approval by an affirmative vote of the school board to create a binding contract for the additional services.[9] *Krasnoff*, 672 A.2d at 862 (citing *Matevish v. Sch. Dist. of Ramey*, 74 A.2d 797 (Pa. Super. Ct. 1950)). Consistent with these cases, the Rendell Letter cannot constitute a binding contract as the mayor lacked both actual and apparent authority under the Philadelphia Home Rule Charter to enter into such a contract. *See* 351 Pa. Code § 4.4-400(c); 351 Pa. Code § 6.6-104.

---

[9]Moreover, the discussion of equitable estoppel in *Scranton* counsels against finding apparent authority. The *Scranton* court considered whether equitable estoppel bound the city, and concluded that entering into a contract without the express approval of the solicitor was unreasonable as a matter of law, given the requirements of the Scranton Administrative Code. *Scranton*, 871 A.2d at 882. The unreasonableness was particularly manifest considering that the plaintiff relied upon statements from a "member[] of the outgoing administration in its waning months." *Id.* at 881.

24

Alternatively, plaintiffs contend defendants ratified the Rendell Letter. "It is well settled that a municipal corporation may ratify contracts which are within its corporate powers and made by its officers without authority, or in excess of their authority." *Eckert v. Pierotti*, 553 A.2d 114, 118 (Pa. Commw. Ct. 1989). A "municipality may waive an irregularity of a municipal contract and ratify that contract." *Scranton,* 871 A.2d at 881 (citing *Eckert*, 553 A.2d at 118). Ratification may consist of affirmative action by the proper officials or by other action or inaction that amounts to approval of the contract under the circumstances. *Id.* But where a previously unauthorized contract is retroactively ratified by post-contract approval, such post-contract ratification must be approved by "everyone whose approval was [previously] required under applicable law." *Id.*; *see also Pittsburgh Baseball*, *Inc.*, 630 A.2d at 509 (finding no ratification); *cf. Eckert*, 553 A.2d at 118 (holding ratification existed based upon formal post-contract approval of the contract at issue). In *Scranton*, where the court found the alleged contract lacked the required approval of the city solicitor, among others, the court also held that there was no post-contract ratification because the evidence "reveal[ed no] approval of the City Solicitor" between the time of the contract and the alleged ratification. *Scranton*, 871 A.2d at 881. Similarly here, plaintiffs presented no evidence of post-contract approval from either the City Law Department or Finance Department, so they cannot establish ratification.

### 3. Contractual Damages

25

Defendants contend the award of contractual emotional distress damages should be overturned. The trial court explained to the jury: "I instruct you that only the [Rendell Letter] is eligible for emotional distress damages . . . ." The jury awarded $100,000 per plaintiff in emotional distress damages. In denying the motion for a new trial, the District Court declined to overturn the award of emotional distress damages totaling $2.4 million.[10] Because the Rendell Letter was not a valid contract, this award must be overturned as well.

The District Court declined to overturn the jury's award of $150,000 in expectation damages based on the Rendell Letter and the 1988 Agreement. The trial court instructed the jury they could award expectation damages for a breach of any of the three contracts. The trial court instructed that the parties had stipulated that expectation damages should be the same whether the jury found that one or all of the potential contracts had been breached: "[I]f you find that there were three contracts, and all three of them were breached, your award would be the same as if there was but one contract breached." The jury found the city breached two of the contracts, the 1988 Agreement and the Rendell Letter. Accordingly, the breach of the 1988 Agreement supports the jury's award of expectation damages. We will affirm the jury award of contractual expectation damages.

---

[10]The District Court molded the $2.4 million award to cover the jury's awards for the contractual emotional distress claim and substantive due process claim.

## B. Substantive Due Process

The jury awarded $152,083.33 per plaintiff for substantive due process violations, consisting of $70,000 per plaintiff in compensatory damages against Mayor John Street, $30,000 per plaintiff in compensatory damages against the city, and $52,083.33 per plaintiff in punitive damages against Mayor John Street in his individual capacity ($3.65 million total). The District Court reduced this award to $2.4 million, striking the punitive damages, and awarded this amount based on both the emotional distress claims and the substantive due process claims, finding the jury awards on these claims duplicative. *Chainey*, 2005 WL 3263042, at *5–6.

Plaintiffs contend the jury's substantive due process verdict was grounded in evidence the city made inadequate repairs[11] and then used strong-arm tactics to remove plaintiffs

_____

[11]The city and the Redevelopment Authority made repairs at significant expense, but often these repairs were substandard or temporary. Some homeowners testified they paid for their own repairs because the city either did not respond promptly or simply failed to correct certain problems. The problems persisted for almost ten years. In 1997, the Army Corp of Engineers report noted several deficiencies in the homes and estimated the cost of repairs at slightly less than $1.7 million. As noted, in 1999, the Redevelopment Authority hired Allied Construction and paid approximately $2 million for repairs. Soon thereafter, Allied Construction requested an additional

27

from their "defective" homes.[12]  Mayor John Street took office in January 2000, as work on the homes stalled.  Over the next few months, city agencies decided the continuing cost of repairs would exceed Allied Construction's estimates.  During this time, Mayor John Street met with homeowners on at least two occasions.  According to several homeowners, he initially gave the impression that the repair work would resume.  At a meeting in April 2000, he stated that the city would inspect all houses.

In June 2000, after inspecting the homes, the Department of Licenses and Inspection noted an original construction defect involving certain air vents through which carbon monoxide could possibly enter the homes.  But the Department of Licenses and Inspection concluded this defect did not render the homes imminently dangerous.  Less than one month later, in July 2000, the mayor sent the homeowners a letter asking them to come to

$800,000 to complete the repairs.  But by the end of 1999, it increased that amount to $2.9 million.

[12]As noted, the city determined the fair-market value of the houses as of May 12, 1985, was approximately $26,000 per house, or $1,586,000 total.  Plaintiffs' expert report estimated that as of March 23, 2005, plaintiffs would need to be reimbursed "in the neighborhood of $250,000" for each house in order to relocate to a similar house in another Philadelphia neighborhood.  Plaintiffs were living in their homes at the time of the trial.

City Hall on July 21.

Homeowners testified they expected Mayor John Street to explain how the city would restart repairs. Instead, the mayor handed each of them a letter stating that their homes were "imminently dangerous" because of possible carbon monoxide problems with the air vents. The letter gave the homeowners ten days to accept $150,000 from the city in exchange for leaving their homes within forty-seven days, by September 6, 2000.[13] The letter explained that if an owner did not accept the offer, "the City will have no choice but to take your property by eminent domain proceedings."

There was evidence presented at trial that the city and Mayor John Street "manufactured" the "imminently dangerous" designation to pressure the homeowners to accept the city's offer and move out. The air vents were installed in 1987, but every homeowner who testified about the issue—most of whom had detectors in their homes—stated they experienced no problems with carbon monoxide.[14] In August 2000, some of the homeowners hired a private contractor who tested twelve homes and found no signs of carbon monoxide. According to one city

---

[13]The offer was $125,000 for the home and $25,000 for relocation expenses.

[14]One homeowner, who has acute asthma, testified that a carbon monoxide system she installed in 1987 had never gone off.

29

official, it would have taken only about one month to replace the heaters if the city had chosen to remedy the "air vent issue" rather than declare the homes imminently dangerous. Significantly, just weeks before the July 2000 meeting, the Department of Licenses and Inspection concluded that the homes were not imminently dangerous. Even defendants "accept on appeal that the jury could have found Mayor Street's July 21 letter was at least partly pretextual, and that the various declarations were motivated at least in part to force [p]laintiffs to accept the Mayor's $150,000 offer." Brief for Defendants at 55. But defendants also assert that these "improper motives" were not legally cognizable because the amount offered for the homes was reasonable and the mayor's actions were not for personal gain.

Twenty-four homeowners, the plaintiffs in this suit, rejected the city's offer. According to their testimony, they were upset by how the city had treated them for years, they believed they had been lied to by Mayor John Street, they did not think the city's financial offer was fair, and they simply did not want to move.[15] Soon after deciding to reject the mayor's offer, plaintiffs obtained injunctive relief in state court. But the city

[15]For example, one plaintiff explained that "I don't think the City has a right to force me to sell my house to them or to move out of the neighborhood that I chose to be in," while another testified that he "would never trade [his neighbors] for anything in the world."

30

allegedly continued to pressure them to move out. In August, the city gas agency turned off gas and water heaters in the homes because of an "unsafe condition" and "red-tagged" them, meaning they could not be used. By October, a state court enjoined the city from demolishing the homes without conducting full eminent domain proceedings and ordered the city to pay for replacement heaters.

In declining to overturn the substantive due process damages award, Judge Fullam held that "[n]ot without some difficulty, I conclude that reasonable minds could well differ as to whether the defendants' actions in this case were sufficiently egregious to constitute a violation of substantive due process." *Chainey*, 2005 WL 3263042, at *4. But the court noted that "the issue is not of crucial importance, since . . . I conclude that most, if not all, of the damages attributable to the substantive due process violation would also be recoverable under some of plaintiffs' other theories . . . ." *Id.* Holding that overlapping damages were awarded for the emotional distress and substantive due process claims, the court molded the verdict. *Id.* at *5. As noted, we will overturn the emotional distress claim. Therefore the $2.4 million damage award will depend entirely on the viability of the substantive due process claim.

The trial court instructed the jury that plaintiffs could recover damages for substantive due process violations based upon: "physical pain, emotional pain and suffering, mental anguish, discomfort, inconvenience, loss of enjoyment of life, distress, embarrassment, and humiliation." The bases for the

31

substantive due process claim, instructed the trial court, were the city's alleged failure to repair the houses, the "red-tagging" of houses in the neighborhood, the offer to purchase plaintiffs' houses, the threat to seize the houses through eminent domain, and the charge that the houses were imminently dangerous. The jury instructions limited the relevant conduct to the city's actions between July 21, 2000 and the present.

Defendants contend plaintiffs cannot recover on a substantive due process claim because plaintiffs never properly proved damages for emotional distress. In order to recover compensatory damages for mental distress, a plaintiff must present evidence of actual injury. *Gunby v. Pennsylvania Elec. Co.*, 840 F.2d 1108, 1121 (3d Cir. 1988) (citing *Carey v. Piphus*, 435 U.S. 247 (1978); *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1200 (3d Cir. 1986)). In *Gunby,* we held that testimony of a disappointed job applicant that he was "very upset" was insufficient to support an award for emotional distress. 840 F.2d at 1120–22. In *Carey*, the Supreme Court noted that "[a]lthough essentially subjective, genuine injury . . . may be evidenced by one's conduct and observed by others." 435 U.S. at 264 n.20. Competent evidence is required to support a damage award for an injury. *Id.* (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350 (1974)). Defendants contend the testimony of several plaintiffs fails to demonstrate that the failure to properly repair the houses caused emotional distress damages.

Defendants point to varying testimony on injury and

32

damages from the twenty-four plaintiffs, breaking down their testimony into five categories. First, some plaintiffs testified they suffered no harm. *See, e.g.*, Trial Tr. at 91 (Mar. 29, 2005) ("Q: And Ms. Campbell, have you suffered, had any type of medical—strike that. Have you suffered in any way because of this incident? A: No, ma'am."). Second, some plaintiffs failed to testify that they suffered any emotional distress. Third, some plaintiffs claimed emotional harm, but testified the harm was caused by the 1985 MOVE bombing, rather than by the city's later actions:

> Q: Mr. Williams, have you and your family suffered from this situation?
>
> A: Quite a bit.
>
> Q: How?
>
> A: Well, we've had counseling after 1985, my sons, my wife and I, we sought counseling.
>
> Q: Okay. And is counseling of the whole family–
>
> A: Well, back then, yes.
>
> Q: And this is due from?
>
> A: From the original fire, right.
>
> Q: Are you still seeking any type of counseling now?
>
> A: No. Just stressed.

Trial Tr. at 76 (Mar. 29, 2005). *See also* Trial Tr. at 17 (Mar. 31, 2005) ("Q: Did you or your family seek any medical

33

treatment because of this incident?  A:  In the beginning, after the bomb was dropped . . . .").  Fourth, some plaintiffs were unclear whether their harm arose from the 1985 MOVE bombing or from the alleged July 2000 breach, and allege harm that the city did not cause:

> Q:    How did your family suffer because of this incident?
>
> A:    Well, my mother and them–she's old . . . and she can't do nothing. And my father, . . . he died last year . . . .
>
> Q:    Well, let me ask you, is that in relation to what happened with this M[OVE] incident?
>
> A:    Yeah—no—I mean, yeah, yeah.
>
> Q:    Is there anything else that has happened to them through suffering because of the M[OVE] incident?
>
> A:    She got Old Timers, Altheimer's (sic), what do you call it?
>
> Q:    Alzheimer's?
>
> A:    Yes.

Trial Tr. at 116–17 (Mar. 30, 2005).  Fifth, some plaintiffs gave vague testimony about "suffering" because of "this incident" or not being secure because of "this situation."  *See, e.g.*, Trial Tr. at 109, 155 (Mar. 30, 2005).  Defendants contend this testimony is insufficient to support recovery for emotional distress and

34

could relate either to the 1985 MOVE bombing or the city's later actions.

At the same time, some plaintiffs testified they suffered damages from the city's actions. One resident testified she developed high blood pressure, lost weight, and could not sleep after the July 2000 meeting with Mayor John Street. Trial Tr. at 35–37 (Mar. 31, 2005). Some residents sent the city a letter in August 2000 indicating they needed stress counseling, and others testified to the indignity of living in a neighborhood filled with boarded-up houses. *See, e.g.*, Trial Tr. at 50, 98–99 (Mar. 29, 2005).

Judge Fullam faced a difficult and sensitive task. Inheriting a case tried by another judge, he was obliged to sort through some contradictory rulings and jury instructions. As a consequence, he did not reach or address defendants' sufficiency of the evidence argument. Nor did he analyze the substantive due process claim because "the issue is not of crucial importance, since . . . I conclude that most, if not all, of the damages attributable to the substantive due process violation would also be recoverable under some of plaintiffs' other theories . . . ." *Chainey*, 2005 WL 3263042, at *4. But as noted *supra,* these damages are not recoverable under the Rendell Letter. Thus, an analysis of the substantive due process claim is now crucial.

In addition, the court erroneously relied upon a fictitious stipulation that "if plaintiffs were entitled to recover damages

35

for 'emotional distress' each set of plaintiffs should be awarded the same amount of money . . . ." *Id.* at \*1. The court held, as a result, "counsel must be deemed to have stipulated that each set of plaintiffs was to be awarded the same amount of damages, if damages were found to be recoverable." *Id.* But no such stipulation exists. Post-briefing, we directed all parties to identify the record citation for the purported stipulation, or if written, to provide a copy. In letter brief responses, neither party was able to identify it. Defendants asserted that "we are not aware of such a stipulation." The only stipulation identified by plaintiffs was that damages for breach of one contract would be the same regardless of how many contracts were breached.

This is not a class action suit; each plaintiff must prove he or she is entitled to damages. There are twenty-four sets of plaintiffs owning separate homes and presenting different and at times contrasting views of the events in question, including causation and damages. Even in the class action context, the ability of each plaintiff to prove damages is often a key issue. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir. 2001) ("The ability to calculate the aggregate amount of damages does not absolve plaintiffs from the duty to prove each investor was harmed by the defendants' practice."). By relying upon the erroneous stipulation, the court reviewed the sufficiency of the substantive due process award

36

collectively instead of individually.[16]

Also, the court failed to address waiver with respect to both plaintiffs and defendants on the sufficiency of the evidence issue. "[A] defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiffs on notice waives the defendant's right to raise the issue in their Rule 50(b) motion." *Williams v. Runyon*, 130 F.3d 568, 571–72 (3d Cir. 1997). But if a plaintiff does not object to a defendant's Rule 50(b) motion "specifically on the grounds that the issue was waived by an inadequate Rule 50(a) motion, the [plaintiff's] right to object on that basis is itself waived." *Id.* at 572.

Post trial, Judge Newcomer, in an August 9, 2005 Order, directed the parties to supplement their post-trial motions with briefing on "whether Defendants have properly maintained a

---

[16]It is also likely that the court's erroneous reliance on "the stipulation" explains the absence of other important analyses. The court did not reach defendants' alternative motion for a new trial based on plaintiffs' failure to prove that defendants' actions caused emotional distress. The court only addressed defendants' new trial request alleging improper cross-examination of Mayor John Street. Also, the court noted the lack of "significant objections to the court's charge," but it did not review the charge for plain error. *See* Fed. R. Civ. P. 51(d)(2); *Alexander v. Riga*, 208 F.3d 419, 426–27 (3d Cir. 2000).

portion of their Rule 50 Motion."[17]   Both parties briefed this issue for the trial court.  But the court's post-trial opinion neither decides nor refers to the Rule 50 waiver motions.

For understandable reasons, the District Court did not address the substantive due process claim, which is now critical on appeal.  Furthermore, the erroneous reliance on a stipulation never agreed to and the absence of analysis on important procedural issues weigh in favor of a remand.  Accordingly, we do not reach the merits of the defendants' contentions, but instead will remand to the district court for a substantive due process and Fed. R. Civ. P. 50 waiver analysis and, if the issue has not been waived, a determination of whether each plaintiff can establish causation and prove damages.

Defendants contend there are more fundamental problems with the substantive due process verdict. Section 1983 provides remedies for deprivations of rights established by the Constitution, including substantive due process under the Fourteenth Amendment. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).  "To state a § 1983 claim, a plaintiff must demonstrate the defendant, acting under color of state law, deprived [plaintiff] of a right secured by the Constitution or the

---

[17]The Order further recited: "The Parties shall specifically brief this Court on (1) whether Defendants have properly made their Rule 50 Motion against Plaintiffs' Breach of Contract Claims, and if they have not, (2) whether Plaintiffs have waived their right to object on this ground."

laws of the United States." *Kaucher,* 455 F.3d at 423 (citing *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)). Accordingly, "[t]he first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *Nicini v. Morra,* 212 F.3d 798, 806 (3d Cir. 2000) (en banc) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)). Furthermore, "the core of the concept [of due process is] protection against arbitrary action" and "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Lewis*, 523 U.S. at 845–46; *see also United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 399 (3d Cir. 2003). The Supreme Court has consistently "spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis*, 523 U.S. at 846; s*ee also United Artists*, 316 F.3d at 399.

To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience. *United Artists*, 316 F.3d at 400–02. For example, we have held "ownership is a property interest worthy of substantive due process protection." *DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell,* 53 F.3d 592, 600 (3d Cir. 1995) *overruled on other grounds by United Artists*, 316 F.3d at 401. In other words, here, plaintiffs must have been deprived of a fundamental

property interest under the Constitution. *See Gikas v. Washington Sch. Dist.*, 328 F.3d 731, 736 (3d Cir. 2003).

As noted, plaintiffs contend the city deprived them of the peaceful enjoyment of their residences caused by the failure to repair the houses resulting in poor conditions, the "red-tagging" of their houses, the declaration of eminent domain, the city's determination that the houses were imminently dangerous, and the undue pressure applied by Mayor John Street to accept the offer to purchase their houses. The crux of plaintiffs' claim is that the city falsely declared their homes imminently dangerous as a pretext to avoid completing the promised repairs. Because plaintiffs remained in their houses at all times, defendants contend no deprivation occurred. In response, plaintiffs claim that courts can find a deprivation of substantive due process without an actual property loss.

Further, defendants contend the relevant conduct after July 21, 2000 does not "shock the conscience."[18] Deprivation violates due process only when it "'shocks the conscience,'" which encompasses "'only the most egregious official conduct.'" *United Artists,* 316 F.3d at 400 (quoting *Lewis,* 523 U.S. at 846). Applying the "shocks the conscience" standard "prevents us from being cast in the role of a 'zoning board of

---

[18]Defendants argue, *inter alia*, that the city's offer of $150,000 for each home, an amount almost double the $80,000 per home the jury awarded as just compensation on the takings claims, cannot shock the conscience.

40

appeals.'" *Id.* at 402 (quoting *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir. 1982) (quoting *Village of Belle Terre v. Boraas*, 416 U.S. 1, 13 (1974) (Marshall, J., dissenting))). While the meaning of the standard varies depending upon factual context, merely alleging an improper motive is insufficient, even where the motive is unrelated to the merits of the underlying decision. *Id.* at 400. In *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274 (3d Cir. 2004), we applied the shocks the conscience standard in a zoning dispute. Plaintiffs alleged that the township "maligned and muzzled" them, applied standards not applied to similar properties, delayed permits and approvals, improperly increased tax assessments, and pursued unannounced and unnecessary enforcement actions in denying zoning requests. *Id.* at 286. But in affirming the trial court's finding that the alleged conduct did not shock the conscience, we noted there were no allegations of corruption, self-dealing, bias against an ethnic group, or additional facts that suggested conscience-shocking behavior. *Id.*

We do not address these issues at this time because the trial court did not analyze the substantive due process claim or the Rule 50 waiver issue and erred in not requiring individual proof of causation and damages. We will remand for an analysis of the substantive due process claim and Fed. R. Civ. P. 50 waiver and, if the issue has not been waived, a determination of whether each plaintiff has adequately proven causation and damages.

41

## C. New Trial Based on Trial Court's Questioning
### of Mayor John Street

In post-trial motions, defendants contended Judge Fullam should have ordered a new trial based on Judge Newcomer's prejudicial questioning of Mayor John Street.[19]

---

[19]Defendants referenced three particular instances:

| | |
|---|---|
| THE COURT: | In the course of your tenure on City Council and as Mayor, has there ever been any event that has been as traumatic in the City of Philadelphia as this event at Osage Avenue? |
| THE WITNESS: | This is way up there, your Honor. It is way up there. |
| THE COURT: | Can you explain why you don't have a better understanding of all these questions that are being asked of you? |
| THE WITNESS: | That's easy to explain. |
| THE COURT: | I wish you would. |
| THE WITNESS: | Because I am Mayor of the fifth largest city in the country . . . . [describing other duties as Mayor of Philadelphia]. |
| THE COURT: | Yet, you can't remember— |
| THE WITNESS: | I just can't remember the details. |

| | |
|---|---|
| THE COURT: | Let me finish. That's an impressive list [of duties of the Mayor]. |
| THE WITNESS: | That's just short or part of the list. |
| THE COURT: | Among your responsibilities, aren't you also responsible for the welfare and the well-being of all of the citizens of Philadelphia and wouldn't that include the people who live at Osage Avenue. |
| THE WITNESS: | Absolutely, your honor. |
| THE COURT: | So, if that is your answer to my question, so be it. |
| THE WITNESS: | Can I explain? |
| THE COURT: | I think you have. |

Trial Tr. at 86–88 (Mar. 31, 2005).

| | |
|---|---|
| [THE WITNESS]: | Because there are—this is a very complicated situation that has been going on . . . for a long, longtime. The incident that occurred that gave rise to all of this litigation, occurred in May of 1985. By the time that I got to be the Mayor, in January of 2000, it is 15 years later . . . . I am telling you that I do not agree that the city was responsible . . . . |

43

| | |
|---|---|
| THE COURT: | Just a minute. That's not what your counsel has informed the Court or this jury. Counsel has informed the Court and the jury unless I'm grossly in error, that the city has accepted responsibility for the damage caused on that occasion. |
| [DEFENDANTS' ATTORNEY]: | Your Honor, the plaintiff counsel is asking— |
| THE COURT: | Am I correct or incorrect? |
| [DEFENDANTS' ATTORNEY]: | I would like to explain that. |
| THE COURT: | Just tell me am I correct or incorrect, have you not so stated for the record? |
| [DEFENDANTS' ATTORNEY]: | I stated for the record, that the city had accepted responsibility. |
| THE COURT: | Very well, that's what I thought I just said. |
| [DEFENDANTS' ATTORNEY]: | Your Honor, I would like to explain. First of all, that— |
| THE COURT: | No, this is not a time to explain. I just wanted you to respond, in view |

|  | of the Mayor's most recent testimony here. |
|---|---|
| [DEFENDANTS' ATTORNEY]: | Then I have an objection to the question as drawing on the—asking for a legal conclusion from the witness. |
| THE COURT: | Overruled. Proceed. |

Trial Tr. at 90–91 (Mar. 31, 2005).

|  |  |
|---|---|
| THE COURT: | My next question is, do you have any way of knowing, have you ever conducted a study or do you have an opinion, as to what it would cost in the aggregate to fix all of these houses, put them in the shape that they were intended to be in? |
| THE WITNESS: | Today, now? |
| THE COURT: | Today. |
| THE WITNESS: | I don't know. |
| THE COURT: | Did you ever do that, ever develop a study? |
| THE WITNESS: | There were people who were responsible for it, trying to figure out how much it would cost. |
| THE COURT: | I'm asking you. |

45

Defendants contend these questions demonstrated animosity toward Mayor John Street and defendants' counsel, and suggested to the jury an answer to the ultimate issue before them. Defendants maintain the trial judge misunderstood the difference between the acceptance of responsibility for the original MOVE incident and for the current repairs, contending

---

| | |
|---|---|
| THE WITNESS: | Did I ever personally do it? No, your Honor. |
| THE COURT: | Someone working for you? |
| THE WITNESS: | I think someone working for the city, did that on numerous occasions. |
| THE COURT: | You should have some kind of response to my question, shouldn't you? |
| THE WITNESS: | I can get a response, your Honor, I don't have that with me. I don't have it in front of me. Nobody told me to bring any documents. People told me to bring my body. |
| THE COURT: | You are here because you are the Mayor of the city. You already testified that it would not be feasible to perform repairs, that's why I'm asking you the question. |

Trial Tr. 115–16 (Mar. 31, 2005).

the jury was either left with the mistaken impression that Mayor John Street did not accept responsibility for the 1985 MOVE bombing or that the court believed that the city was legally responsible for the 2000 repairs.

Judge Fullam characterized these questions by the trial judge as "expressing surprise" that Mayor John Street could not recall key occurrences and suggesting the Mayor should have "been more solicitous of the welfare of his citizens." *Chainey*, 2005 WL 3263042, at *6. But as Judge Fullam noted, the trial judge immediately issued a curative instruction to the jury after the third exchange. *Id.* Moreover, Judge Fullam noted the questions might have influenced only the punitive damages award against the Mayor, which he overturned. *Id.* Because the evidence on the breach of contract claims likely entitled plaintiffs to judgment as a matter of law, said Judge Fullam, any error would be harmless. *Id.*

We review for abuse of discretion. *Adedoyin,* 369 F.3d at 342 (citing Fed. R. Evid. 614(b)). Evidence Rule 614(b) provides that the court may interrogate witnesses. *Id.* This has been an important and longstanding practice on the part of trial judges and should not be discouraged. *See Riley v. Goodman*, 315 F.2d 232, 234 (3d Cir. 1963) ("We have long abandoned the adversary system of litigation which regards opposing lawyers as players and the judge as a mere umpire whose only duty is to determine whether infractions of the rules of the game have been committed."). Of course, a judge must not "abandon his [or her] proper role and assume that of an advocate." *United*

47

*States v. Green*, 544 F.2d 138, 147 (3d Cir. 1976). But the abuse of discretion standard is a deferential one and in order to meet the standard the conduct of a trial judge must be "inimical and partisan, clearly evident and prejudicial." *Riley,* 315 F.2d at 235. In making this determination, "[e]ach case must be viewed in its own setting." *Id.* at 234.

The trial judge instructed the jury that his questioning of Mayor John Street was directed toward the city's acceptance of responsibility for the MOVE bombing itself, not the city's responsibility to warranty the rebuilt houses, the central issue in this case.[20] Furthermore, we fail to see prejudice. *See United States v. Beaty*, 722 F.2d 1090, 1093 (3d Cir. 1983) ("We must determine whether [the trial judge's] conduct was so prejudicial as to deprive defendant . . . of a fair, as opposed to a perfect, trial.") (citations omitted).

Defendants also contend the trial judge's questions affected their ability to disclaim responsibility for the repairs.

---

[20]To support their argument, defendants rely on *United States v. Filani*, 74 F.3d 378 (2d Cir. 1996), a criminal case. In *Filani*, the defendant was the only defense witness and his credibility was determinative. The trial judge challenged the defendant several times and interfered repeatedly with the defense counsel's cross-examination of witnesses. *Id.* at 381–82. In this case, the crux of the claim was a written contract. Furthermore, Judge Newcomber emphasized to the jury that they alone must determine the facts.

But insofar as the jury awarded contractual expectation damages, they were based on the 1988 Agreement and the expectations of the homeowners, not the testimony of Mayor John Street.  We agree with Judge Fullam that the trial judge's questioning did not affect the outcome.  Accordingly, we will affirm the denial of a new trial on this ground.

### D.  Takings Clause Verdict

The jury entered a verdict for plaintiffs on their takings clause claims and awarded $80,000 per plaintiff.  The District Court reversed this verdict, finding no takings occurred because at all times plaintiffs continued to reside in their homes.  Hence, there was no deprivation.  The District Court noted that if a taking had occurred "plaintiffs would have been entitled to pursue remedies under the state eminent domain statute . . . ." *Chainey*, 2005 WL 3263042, at *4.  Plaintiffs contend we should reinstate both the verdict and the damage award because they proved defendants deprived them of all economically viable uses of their property.  They contend they have no remedy under the state eminent domain code because the city's actions "poisoned the market" for their homes.

The takings claims are not ripe because plaintiffs never pursued their takings clause claims in state court.  A plaintiff must first "seek compensation through the procedures the State has provided for doing so" before asserting a federal takings claim. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson*, 473 U.S. 172, 194 (1985).  In *Williamson*,

49

after the plaintiff purchased land to develop residential housing, defendant-county adopted a zoning ordinance restricting the permissible density. Plaintiff alleged a taking, claiming he was deprived of all economically viable use of the land. *Id.* at 177–83. The Court rejected plaintiff's claim because, as yet, there had been no denial of just compensation. Construing the Fifth Amendment ("[N]or shall private property be taken for public use, without just compensation."), the Court explained the "Fifth Amendment does not proscribe the taking of property;" instead, it only "proscribes takings *without just compensation*." *Id.* at 194 & n.13 (emphasis in original).

The Fifth Amendment does not require at the time of the taking that just compensation be paid, but only that a "reasonable, certain and adequate provision for obtaining compensation exist." *Id.* at 194 (citations omitted). Accordingly, if there is an adequate provision for compensation, "no constitutional violation occurs until just compensation has been [subsequently] denied." *Id*. at 194 n.13. In *Williamson,* because Tennessee law provided a procedure by which plaintiff could obtain just compensation for the alleged diminution in value of plaintiff's property, plaintiff's claim was not ripe. *Id.* at 196; *see also Stern v. Halligan*, 158 F.3d 729, 734 (3d Cir. 1998) ("The plaintiffs have not, so far as the record shows, sought compensation through state proceedings. Accordingly, plaintiffs' takings claim must be rejected."); *cf. County Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159, 168 (3d Cir. 2006) (holding takings claim was ripe because plaintiff had exhausted

50

state procedures).  As the Supreme Court recently stated:

> there is scant precedent for the litigation in federal district court of claims that a state agency has taken property in violation of the Fifth Amendment's takings clause.  To the contrary, most of the cases in our takings jurisprudence . . . came to us on writs of certiorari from state courts of last resort.

*San Remo Hotel, L.P. v. City and County of San Francisco*, 545 U.S. 323, 347 (2005); *cf. First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 312 n.6 (1987) (distinguishing *Williamson* because California had no just compensation procedures).

Pennsylvania provides adequate process for plaintiffs to obtain just compensation.  Pennsylvania's Eminent Domain Code provides inverse condemnation procedures through which a landowner may seek just compensation for the taking of property.  *See* 26 Pa. Cons. Stat. §§ 308, 502(c), 709.  Here, plaintiffs failed to pursue an inverse condemnation.  They contend they did not need to pursue the takings clause claims in state court because they were not seeking just compensation.  But in fact that is the basis of their claim—just compensation for the reduction in fair market value of their homes.

In *Cowell v. Palmer Twp.*, 263 F.3d 286, 290 (3d Cir. 2001), plaintiffs in a federal suit alleged a taking when the municipality allegedly reduced the property's value by

improperly imposing liens on plaintiffs' property. We rejected plaintiffs' argument that they were not required to file a claim in state court. *Id.* at 291. Where there is a procedure for seeking just compensation, "the property owner cannot claim a violation of the [Takings] Clause until it has used the procedure and been denied just compensation." *Williamson*, 473 U.S. at 195.

Accordingly, plaintiffs claims are not ripe, and we do not reach the issue of whether a deprivation occurred. The District Court correctly acknowledged that if a taking had occurred, plaintiffs must pursue their claim in state court. As noted, the District Court held that no taking occurred and set aside the jury award on the takings claims. We will affirm but on different grounds. We will set aside the jury award on the ground that plaintiffs' takings claims are not ripe for adjudication.

## III.

For the reasons set forth, we will affirm in part and reverse in part the judgment of the District Court. We will remand on the issues of substantive due process, Fed. R. Civ. P. 50 waiver, and, if the issue has not been waived, whether each plaintiff proved causation and damages for the substantive due process claims.