Mark R. Hornak, Chief United States District Judge
Pending before the Court are two Motions to Dismiss Plaintiff's Complaint. (Mots., ECF Nos. 19, 21; Compl., ECF No. 1.) Defendants Michael Bartolini, Blairsville-Saltsburg School District (the "School District"), Linda Brown, Beverly Caranese, Holly Hall, and Marlene Joyce filed their collective Motion to Dismiss (ECF No. 19 ), and Defendant John Cambest filed his own Motion to Dismiss, ECF No. 21. For the reasons that follow, both Motions are granted.
I. Background
This defamation case arises out of a public statement made by Plaintiff Tammy Caristo ("Plaintiff")[1] impugning the ethics and conduct of the Defendants and a press statement issued by the School District *558 responding to Plaintiff, all of which related to Plaintiff's tenure as Superintendent of the School District.
Plaintiff was hired by the School District as Superintendent in 2010. (Compl. ¶ 7.) On December 7, 2016, the School District suspended Plaintiff without pay. (Id. ¶ 8.) Defendants Michael Bartolini, Linda Brown, Beverly Caranese, Holly Hall, and Marlene Joyce (collectively, "School Board Member Defendants") were five members of the School District's nine-member Board and had all voted in favor of the suspension.[2] (Id. )
Following that suspension, Plaintiff commenced a civil action (also in this Court) against the School District and the School Board Member Defendants alleging that she was retaliated against in violation of 42 U.S.C. § 1983, state whistleblower laws, and state contract law when she engaged in legally protected public speech concerning financial waste by the School District. (Id. ¶ 9.) That civil action settled via a written Settlement Agreement and Release, executed on November 22, 2017 ("Settlement Agreement"). (Id. ¶ 10.) Pursuant to the terms of the Settlement Agreement, Plaintiff received a monetary payment, she released School Board Member Defendants and the School District for liability for prior acts, and she resigned from her employment as Superintendent of the School District. (Id. )
Plaintiff gave a statement about the Settlement Agreement that made its way into newspaper articles published by TribLive and the Indiana Gazette. (Id. ¶¶ 41-42.) According to the Complaint, "Plaintiff's statement concerned false allegations, wrongdoing, misconduct, and financial waste by the [School] District and the School Board [Member] Defendants." (Id. )[3]
The School District then released a written "Press Statement" via its public website, and Defendant John Cambest, Solicitor for the School District, read the Press Statement aloud at a school board meeting on December 6, 2017.[4] (Id. ¶¶ 4, 11.) The Press Statement states that its purpose is to "clear up the misstatements and fake news given to" the newspapers, presumably by Plaintiff. (Press Statement, ECF No. 1-2.) The Press Statement included the following statements, which Plaintiff alleges are "false and defamatory":
a) "Over the course of [Plaintiff's] superintendency, she refused to communicate with [School] Board Members and other Administrators on critical [School] District matters, engaged in unethical behavior involving *559 investigations surrounding family members...."
b) "[I]t was discovered that [Plaintiff] had violated not only District Policy but also provisions of the Pennsylvania School Code...."
c) "[Plaintiff] chose not to participate in the Due Process Hearings to defend or explain her actions leaving the Board of School Directors no choice but to suspend her without pay...."
(Id. ¶ 13.) The Press Statement also lists allegations that were lodged against Plaintiff pending a Section 1080 Hearing[5] following her December 2016 suspension. (Press Statement, at 1.) In her Complaint, Plaintiff alleges that the allegations enumerated below are also "false and misleading" statements: (Compl. ¶ 13.)
d) "[Plaintiff] filed a lawsuit against a family without Board approval in violation of the Pennsylvania School Code."
e) "[Plaintiff] unilaterally transferred teachers without Board approval in violation of District Policy, the Teachers Contract and her own Contract. It was often reported to the Board that this was done as a form of control and retaliation/favoritism of professional teachers."
f) "[Plaintiff] participated in and conducted an investigation involving a family member on two (2) separate occasions. The actions of [Plaintiff] were unethical especially after being warned the first time in regard to a similar incident."
g) "It was discovered that student expulsion procedures were violated in accordance with the Pennsylvania School Code and District Policies."
h) "[Plaintiff] broke confidentiality of students and violated her own Contract by speaking out about internal investigations prior to their being accepted by the Board."
i) "The District lost two (2) students in a short period of time and as the District and community were coming together to mourn the Superintendent went to an education conference. It was later discovered that [Plaintiff] chose not to stay in the District but instead to attend the conference in an attempt to influence the person conducting a separation report of the Blairsville-Saltsburg School District. This was reported to the Board of School Directors by the individual conducting the separation report."
j) "[Plaintiff] conducted over ninety-five (95) Loudermill Disciplinary hearings in five (5) years. The Superintendent was given no authority to conduct any of these hearings. The Board received many complaints by staff and professional employees that [Plaintiff] used these Hearings to threaten jobs and flex her power within the District[.] [O]ne case cost the District in excess of $ 200,000 in back pay and legal and arbitration fees."
k) "During her superintendency, [Plaintiff] failed to properly supervise the employees in her Administration and often took time off without notifying the Board or leaving proper Administrators in charge of the District."
*560 l) "During her superintendency, [Plaintiff] unilaterally and without Board approval hired Professional Employees on incorrect salary steps in violation of District Policy with a financial liability to the District of Fifty Thousand ($ 50,000.00) Dollars."
m) "During her superintendency, [Plaintiff] allowed overtime pay to be withheld for certain employees. This had liability to the District of approximately Thirty Thousand ($ 30,000.00) Dollars."
n) "During her superintendency, [Plaintiff] allowed pay advancements for employees on leave that were not approved by the Board which required the District to recover funds of approximately Fifteen Thousand ($ 15,000.00) Dollars that were improperly spent. The District may have additional liability to the District that is unaware of."
(Id. )
Plaintiff alleges that all Defendants knew that these statements were false or made with reckless disregard for their falsity, and these statements were made "knowingly, willfully, and maliciously for the purpose of causing Plaintiff to suffer harm to her reputation, to hold her up for public ridicule, blacken her character, discredit her, and subject her to further harm and injury." (Id. ¶¶ 14-15.) The Press Release was later republished in print and online by various news outlets. (Id. ¶ 16.)
Plaintiff brings this lawsuit alleging that the publication of the "false and defamatory statements" via the Press Statement caused Plaintiff to suffer injury to her reputation and standing in the community, humiliation, public embarrassment and stigma, severe anxiety, distress, emotional pain and suffering, lost earnings and lost earning ability. (Id. ¶ 17.)
Count I of the Complaint asserts a claim for defamation (libel/slander), presumably under Pennsylvania common law, against the School Board Member Defendants and Mr. Cambest. (Id. ¶¶ 18-23.) Count II asserts a claim pursuant to 42 U.S.C. § 1983 for violation of the Fourteenth Amendment against the School Board Member Defendants and Mr. Cambest. (Id. ¶¶ 24-30.) Count III asserts claim pursuant to 42 U.S.C. § 1983 for violation of the Fourteenth Amendment against the School District. (Id. ¶¶ 31-38.) Count IV asserts a claim pursuant to 42 U.S.C. § 1983 First Amendment retaliation against the School District. (Id. ¶¶ 39-46.) The filed Motions to Dismiss attack the validity of each claim asserted.
II. Legal Standard
A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining upon whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pleaded factual allegations in the complaint and views them in a light most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is *561 liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955 ).
Our Court of Appeals has instructed that "a court reviewing the sufficiency of a complaint must take three steps," Connelly v. Lane Construction Corp. , 809 F.3d 780, 786-87 (3d Cir. 2016), explaining:
First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." Iqbal, 556 U.S. at 675, 129 S.Ct. 1937. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 679, 129 S.Ct. 1937. See also Burtch v. Milberg Factors, Inc. , 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (citation and editorial marks omitted) ). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679, 129 S.Ct. 1937.
Connelly, 809 F.3d at 786-87. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679, 129 S.Ct. 1937. A plaintiff must set forth "sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence" of the elements of the claim for relief Trzaska v. L'Oreal USA, Inc. , 865 F.3d 155, 162 (3d Cir. 2017). See also Connelly, 809 F.3d at 789.
III. Discussion
A. Count I: State Law Claims for Defamation
Count I of the Complaint asserts a claim for defamation (libel/slander) under Pennsylvania common law against the School Board Member Defendants and Mr. Cambest (collectively, "Individual Defendants"). The Individual Defendants argue that they are immune from suit for state law defamation under Pennsylvania's doctrine of high public official immunity. As explained below, the Court will apply such absolute immunity to each Individual Defendant, and Count I will be dismissed with prejudice.
"In Pennsylvania, high public official immunity is a long-standing category of common law immunity that acts as an absolute bar to protect high public officials from lawsuits arising out of actions taken in the course of their official duties and within the scope of their authority." Doe v. Franklin County, 644 Pa. 1, 174 A.3d 593, 603 (2017). Thus, absolute immunity applies if (1) the individual is determined to be a high public official, and (2) the statements made or actions taken were in the course of the official's duty or power and within the scope of his authority. Mollan v. Lindner, 544 Pa. 487, 677 A.2d 1194, 1199 (1996).
1. Raising high public official immunity at the motion to dismiss phase
Plaintiff initially challenges whether the Individual Defendants can raise this affirmative defense of immunity at this motion to dismiss stage, primarily relying on this Court's decision in Ferrone v. Onorato, 439 F.Supp.2d 442, 455 (W.D. Pa. 2006). Plaintiff misconstrues Ferrone. Rather, it is well established that a defendant can succeed in claiming immunity from suit at the motion to dismiss phase "so long as there are sufficient facts for the court to complete the requisite analysis."
*562 Mazza v. Tredyffrin Twp. , No. 15-4245, 2016 WL 270220, at *2, 2016 U.S. Dist. LEXIS 6918, at *4 (E.D. Pa. Jan. 21, 2016) (citing Thomas v. Independence Twp. , 463 F.3d 285, 293-94 (3d Cir. 2006) ). In fact, the Supreme Court of the United States "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).
It is true that not all immunity questions can be resolved at the motion to dismiss phase. Dismissal on the basis of immunity is not appropriate on a motion to dismiss when immunity is not established on the face of the Complaint. Thomas, 463 F.3d at 291. See, e.g., Webb v. Borough , No. 11-7834, 2012 WL 3020504 at *3, 2012 U.S. Dist. LEXIS 102664 at *10 (E.D. Pa. July 24, 2012) (concluding it could not determine whether a police chief was a high public official for purposes of immunity on a motion to dismiss). That was the case in Ferrone, where this Court was unable to determine whether the defendants were entitled to application of Pennsylvania's doctrine of high public official immunity on the pleading; therefore, the Court denied the motion to dismiss without prejudice.[6] 439 F.Supp.2d at 455. Ferrone certainly does not stand for a general prohibition on evaluating such an affirmative defense at the motion to dismiss phase.[7] Accord Heller v. Fulare , 454 F.3d 174, 180 (3d Cir. 2006) (concluding district court erred in denying motion to dismiss for immunity under Pennsylvania's doctrine of high public official immunity). Thus, it is appropriate for the Court to evaluate the arguments with respect to the affirmative defense of immunity here and now.
2. Whether the Individual Defendants are high public officials
In order to apply high public official immunity, the Court must first make the determination that each Individual Defendant in fact held a high public office. "[T]he determination of whether a particular public officer is protected by absolute privilege should depend upon the nature of his duties, the importance of his office, and particularly whether or not he has policy-making functions." Montgomery v. Philadelphia, 392 Pa. 178, 140 A.2d 100, 105 (1958). But discovery is not always necessary to make such a determination because courts have already recognized that certain positions constitute such a high office. Ruder v. Pequea Valley Sch. Dist. , 790 F.Supp.2d 377, 401 (E.D. Pa. 2011) (citing Petula v. Mellody, 158 Pa.Cmwlth. 212, 631 A.2d 762 (1993), and Matta v. Burton, 721 A.2d 1164, 1166 (Pa. Commw. Ct. 1998) ). Here, the Court must determine whether Pennsylvania school board members and a school board solicitor fall into that category of high public officials or whether discovery is necessary to make such a determination.
i. School Board Member Defendants
At the motion to dismiss phase, district courts in this Circuit have split on *563 the issue of whether school board members qualify as "high public officials." But a large majority of courts (including this Court) have concluding that they do, as school board members are entrusted with the policymaking role for a school district. Zurchin v. Ambridge Area Sch. Dist. , 300 F.Supp.3d 681, 695 (W.D. Pa. 2018) (dismissing state claims against school board members in their official capacity on a motion to dismiss because it is "well-established" that school board members are high public officials entitled to absolute immunity);[8] see also Warkevicz v. Berwick Area Sch. Dist. , No. 15-cv-01922, 2016 WL 3753108, at *9, 2016 U.S. Dist. LEXIS 91374, at *28 (M.D. Pa. July 14, 2016) (same); Markovich v. Panther Valley Sch. Dist. , No. 13-cv-3096, 2014 WL 3735292, at *9-10, 2014 U.S. Dist. LEXIS 102172, at *25-26 (M.D. Pa. July 28, 2014) (same); Kohn v. Sch. Dist. , 817 F.Supp.2d 487, 512 (M.D. Pa. 2011) ("There is no doubt that, as defined in the doctrine, the Elected School Board members are high public officials...."); Kern v. Schuylkill Intermediate Unit 29, No. 08-cv-1601, 2010 WL 235107, at *7, 2010 U.S. Dist. LEXIS 3216, at *22 (M.D. Pa. Jan. 15, 2010) ("School Board members ... qualify as high public officials."); Graham v. Avella Area Sch. Dist. , No. 05-cv-1344, 2006 WL 1669881, at *5, 2006 U.S. Dist. LEXIS 39258, at *13 (W.D. Pa. June 14, 2006) (same but denying motion to dismiss because actions were beyond official authority); Wagner v. Tuscarora Sch. Dist. , No. 04-cv-1133, 2005 WL 2319141, at *8, 2005 U.S. Dist. LEXIS 45663, at *22 (M.D. Pa. Sept. 21, 2005) (concluding school board members are high public officials entitled to absolute immunity);[9] Zugarek v. Southern Tioga Sch. Dist. , 214 F.Supp.2d 468, 479 (M.D. Pa. 2002) (same).
Plaintiff directs the Court to Ruder, in which the district court concluded, on a motion to dismiss, that school board members did not qualify under the doctrine. 790 F.Supp.2d at 401. Ruder appears to be the only case in this Circuit that takes this position with respect to school board members. Interestingly, Ruder extended absolute immunity to the president of the school board but not to the remaining members of the school board yet provided no explanation of the practical differences between those positions with respect to their duties or policy-making functions.[10] Id. One other case deferred its ruling on this immunity doctrine to allow the parties to develop a factual record.
*564 Snook v. Midd-West Sch. Dist. , No. 14-cv-948, 2015 WL 1209756, at *15-16, 2015 U.S. Dist. LEXIS 32211, at *40 (M.D. Pa. Mar. 16, 2015) ("[I]nformation before this Court as to the scope of the School Board Officials' duties.... [is not] sufficient information to determine whether the individual defendants are entitled to high public official immunity.").[11]
A vast majority of cases, including the most recent case from this Court, have concluded on motions to dismiss that school board members are entitled to high public official immunity. This Court will follow that majority approach. A court determining whether a particular individual qualifies as a high public official looks to "the official's duties, the importance of her office, and whether she has policy-making functions." Matta, 721 A.2d at 1166. As Plaintiffs Complaint acknowledges, school board members have extensive and important duties, including voting on whether to terminate or suspend district superintendents. (Compl. ¶ 8); see also 24 P.S. § 10-1080 (requiring board of school directors to conduct a hearing, vote on removal of superintendents, and publicly disclose such removal). Of course, the duties of a school board director are much broader, ranging from the establishment and maintenance of elementary public schools, 24 P.S. § 5-501, to operating all food service programs, 24 P.S. § 5-504.1. The School Board even has the power to levy and collect taxes. 24 P.S. § 5-507. This is because Pennsylvania school board members are indeed "entrusted with the policymaking role for the School District," Zugarek, 214 F.Supp.2d at 479, and they "routinely make[ ] significant public policy decisions." Lindner, 677 A.2d at 1199. Given these important duties and their policy-making functions, extending absolute immunity to the School Board Member Defendants promotes the doctrine's purpose of removing "any inhibition which might deprive the public of the best service of its officers and agencies[, e]ven through the innocent may sometimes suffer irreparable harm...." Id. at 1196.[12] The School Board Member Defendants are entitled to absolute immunity from the state law claims in this case so long as they were acting in their official capacity as to the Press Statement.
ii. Defendant Cambest
Although there is less case law on whether a school district solicitor qualifies *565 as a high public official for purposes of absolute immunity, the cases that have considered the issue have concluded that a solicitor does in fact qualify as a high public official for purposes of absolute immunity. In Klatch-Maynard v. Sugarloaf Township , the district court concluded that a township solicitor was entitled to high public official immunity. No. 06-cv-00845, 2012 WL 3597185, at *3, 2012 U.S. Dist. LEXIS 116845, at *10 (M.D. Pa. Aug. 20, 2012). This conclusion was made at the summary judgment stage, but the Maynard court relied upon Pennsylvania legal authority rather than factual circumstances of that particular case to reach its conclusion, specifically Alston v. PW-Phila. Weekly, 980 A.2d 215, 218 & n.3 (Pa. Commw. Ct. 2009), where preliminary objections filed by the city solicitor on the basis that he was immune by virtue of his "high public official" status were granted. See Osiris Enters. v. Borough of Whitehall, No. GD 03-12928, 2004 WL 5050296 n.1 (Allegheny Cty. C.P. Sept. 22, 2004) (granting preliminary objections and concluding that defendants, including borough solicitor, were entitled to high public official immunity).
Other county attorneys have been recognized to have high public official immunity. In Durham v. McElynn, the Pennsylvania Supreme Court recognized the importance of extending absolute immunity to assistant district attorneys because while they may not have a strong policy-making function, "it is the public interest in seeing that the official not be impeded in the performance of important duties." 565 Pa. 163, 772 A.2d 68, 70 (2001). The same rational applies to the attorney for school boards. Thus, the Court concludes that Pennsylvania law extends high public official immunity to school board solicitors so long as they are acting in their official capacity.
3. Whether the Individual Defendants' alleged statements were made in the course of their official duty or power and within the scope of their authority
The facts alleged in the Complaint plainly demonstrate that the Individual Defendants were acting within the scope of their official authority and in the course of their official duties. All alleged "statements" were made via a reading of the Press Statement during a school board meeting or via an official medium-the School District's public website. (Id. ¶¶ 4, 11.) See Markovich , 2014 WL 3735292, at *10, 2014 U.S. Dist. LEXIS 102172, at *27 (statements made by school board official, even if disorderly and against the advice of the solicitor, at school board meeting and via blog posts all related to the school board position in which board members were conducting business, so absolute immunity applied). Any personal or political motive, presence of malice, or intent to do harm is immaterial for purposes of this absolute privilege. Montgomery, 140 A.2d at 101 n.1. Therefore, Plaintiff's argument that "the context and capacity in which [the School Board Member Defendants] undertook any of the underlying actions is unknowable" simply has no merit in light of the allegations of Plaintiff's own Complaint. (Br. in Opp'n, ECF No. 26, at 16.)
All of Plaintiff's public allegations went directly to the lawfulness of the official conduct of the School District and its School Board and relative to her conduct in her statutory role. The School District's Press Statement was likewise directed at the School District's and School Board's assessment of the conduct of these same operations and official duties. The matters in both Plaintiff's published statements and the School District's Press Statement were indisputably involving matters of public concern, and the School District's *566 press statement was an official action directed by, as Plaintiff's pleads, a majority of the School Board.
All Individual Defendants are considered high public officials for purposes of the high public official immunity doctrine. Because all the alleged conduct occurred within the scope of the Individual Defendants' authority and was made in the course of their official duties, the Court concludes that the Individual Defendants are all cloaked with absolute immunity for the conduct alleged in the Complaint.[13] As such, Count I is dismissed with prejudice against all Individual Defendants.
B. Count II: Section 1983 Fourteenth Amendment Against Individual Defendants
Plaintiff alleges that the Individual Defendants violated Plaintiff's Fourteenth Amendment rights by making defamatory statements, and she brings claims under 42 U.S.C. § 1983.[14] All Individual Defendants argue that Count II should be dismissed against each of them because the Complaint does not sufficiently allege a denial of a federally protected right, a key element to any § 1983 defamation claim. Further, Defendant Cambest argues that he is shielded from § 1983 liability under the doctrine of qualified immunity.
Plaintiff's Complaint alleges in conclusory fashion that her Fourteenth Amendment rights were violated because she was deprived of both liberty and property rights, "namely, Plaintiff's interest in her reputation and ability to obtain employment." (Compl. ¶ 29.) See also 42 U.S.C. § 1983. Plaintiff's Complaint generally refers to the "Fourteenth Amendment," but is otherwise unspecific as to the source of her claim.
1. Procedural Due Process
In order to determine whether the Individual Defendants' actions, as alleged in the Complaint, deprived Plaintiff of procedural due process, the Court "must first ask whether the asserted individual interests are encompassed within the [F]ourteenth [A]mendment's protection of 'life, liberty, or property.' " Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008) (quoting Robb v. City of Philadelphia, 733 F.2d 286, 292 (3d Cir. 1984) ). The asserted interests in this case are Plaintiff's reputation[15] and her ability to *567 obtain employment.[16] While an individual has a protectable interest in their reputation, Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), "reputation alone is not an interest protected by the Due Process Clause." Dee, 549 F.3d at 233 (citing Clark v. Twp. of Falls, 890 F.2d 611, 619 (3d Cir. 1993) ). To show a violation of the procedural due process clause, Plaintiff must also show a deprivation of some additional right or interest. Id. at 233-34. Thus, the question becomes whether Plaintiff's alleged impaired (but at this point inchoate) ability to obtain employment is a sufficient "plus" deprivation to state a due process claim. It is not.
Our Court of Appeals analyzed this precise issue in Randall v. Facebook, Inc. , an unpublished opinion, where the plaintiff had asserted that a press release disseminated over social media about his prosecution for organized crime charges defamed him and limited his prospects for employment as a musician. 718 F. App'x 99, 100, 101 (3d Cir. 2017). Our Court of Appeals concluded that the plaintiff's claim was foreclosed by the United States Supreme Court's decision in Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), in which the Supreme Court "stated that a claim of defamation ... was not a federal claim even if it would 'seriously impair [that person's] future employment opportunities.' " 718 F. App'x at 101 (quoting Paul, 424 U.S. at 697, 96 S.Ct. 1155 ). Accordingly, the plaintiff's complaint failed to state a "stigma-plus" claim, and our Court of Appeals affirmed the dismissal of the complaint. Id. Similarly, in King v. Deputy Attorney General of Delaware , another unpublished opinion, our Court of Appeals noted that the plaintiff did not plead a cognizable federal defamation claim on the basis that a press release defamed him and limited his prospects for employment as a social worker. 616 F. App'x 491, 497 n.8 (3d Cir. 2015). The bottom line is that our Circuit simply has not recognized "allegations of 'possible loss of future employment opportunities' [or] even outright 'financial harm' " as viable "plus" deprivations to fulfill the "stigma-plus" test for a federal defamation claim. Simpson v. Nicklas, 500 F. App'x 185, 188 (3d Cir. 2012) (quoting first Clark, 890 F.2d at 620,[17] and quoting second Sturm v. Clark, 835 F.2d 1009, 1013 (3d Cir. 1987) );
*568 see also Steffey v. Agora Cyber Charter Sch. , No. 18-cv-1182, 2018 WL 6696816, at *4, 2018 U.S. Dist. LEXIS 214153, at *11 (E.D. Pa. Dec. 19, 2018) (plaintiff simply asserted "harm ... to her future employment prospects" but failed to alleged specific injury to her future employment prospects).
The Court concludes that Plaintiff's Complaint fails to satisfy the "stigma-plus" test because statements that Plaintiff has suffered lost future employment opportunities, "lost earnings," and "suffered a permanent impairment of her ability to earn" are insufficient to satisfy the "plus" component of the "stigma-plus" test for a procedural due process claim.[18]
2. Substantive Due Process
"To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience."[19] Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008). To show that Plaintiff's particular interest in future employment opportunities as a school superintendent is protected by the substantive due process clause, Plaintiff quotes Burns, where this Court noted that although our Court of Appeals has not clarified whether the liberty to pursue an occupation is sufficiently "fundamental" to qualify for substantive due process protection, this Court considered "the liberty to pursue a calling or occupation, unlike the right to a specific job, [to be] entitled to substantive due process protection." Burns, 776 F.Supp.2d at 92. However, this is constrained by the reality that decreased business opportunities or a decreased ability to earn a living based on reputational injury alone is insufficient to state a substantive due process claim. Hill v. Borough of Kutztown, 455 F.3d 225, 234 n.12 (3d Cir. 2006). Rather, a plaintiff must show an actual inability to pursue a chosen profession. Arneault v. O'Toole, 864 F.Supp.2d 361, 402 (W.D. Pa. 2012) ; see also Hart v. W. Mifflin Area Sch. Dist. , No. 16-cv-1066, 2016 WL 7157212 at *3-4, 2016 U.S. Dist. LEXIS 169473 at *9 (W.D. Pa. Dec. 8, 2016) ("[T]o the extent Plaintiff claims that he has suffered loss of future employment as a result of the publication of these online statements, his allegations are insufficient, as he alleges (if anything)
*569 only a generalized threat of lost future employment opportunities.").[20] Just as the generalized allegations of potential lost future employment were insufficient to show a procedural due process violation, they are also insufficient to show a substantive due process violation.
Therefore, the Court will dismiss Count II against all Individual Defendants but without prejudice. The Court cannot conclude that amendment would necessarily be futile, but in light of the principles set out in Randall and Hill, it likely is. Plaintiff will be given one opportunity to amend to specifically set forth the precise type of actual harm suffered to fulfill the directions of Randall and Hill, as her vague and generalized allegations to date fall woefully short of that mark.[21] The Court defers its decision on Defendant Cambest's qualified immunity defense until Plaintiff has amended her Complaint in a further effort to state a claim.
C. Count III: Section 1983 Fourteenth Amendment Against the School District
The School District argues that Plaintiff fails to state a claim for municipal liability based on the Individual Defendants' actions because the Complaint fails to allege the existence of any policy or custom allegedly violated. Plaintiff counters that the School Board Member Defendants' decision to issue the Press Statement "represents an act of official government policy," which is enough to place liability on the School District. (ECF No. 26, at 13.) Because the Court has dismissed the claims against the Individual Defendants, the identical claims against the School District must also be dismissed. Hill, 455 F.3d at 245. However, because Plaintiff will be given leave to amend her Fourteenth Amendment claims, the Court will reiterate the proper standard for a § 1983 claim against a municipality, which our Court of Appeals summarized in Hill in the context of claims related to reputation:
A municipality may not be held liable under § 1983 for the constitutional torts of its employees by virtue of respondeat superior. Rather, a municipality may be held liable for the conduct of an individual employee or officer only when that *570 conduct implements an official policy or practice. Monell v. N.Y.C. Dept. of Soc. Servs. , 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ; McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005).
An individual's conduct implements official policy or practice under several types of circumstances, including when (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred. See generally Pembaur v. City of Cincinnati, 475 U.S. 469, 478-484, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) ; McGreevy, 413 F.3d at 367 ; LaVerdure v. County of Montgomery , 324 F.3d 123, 125-126 (3d Cir. 2003).
Hill, 455 F.3d at 245. Further, in order to state a claim under the number (2) referenced above, the Complaint must allege that specific actors were final policy-makers. Id. As pled, Count III is legally insufficient, and will be dismissed without prejudice, but with one opportunity to amend to state a plausible claim. Should Plaintiff amend her claim against the School District, she must sufficiently allege facts plausibly showing at least one of the three circumstances identified above.[22]
D. Count IV: Section 1983 First Amendment Retaliation Against the School District[23]
Plaintiff argues that the statement she gave and as relayed verbatim in newspaper articles after the Settlement Agreement related to matters of public concern and are protected under the First Amendment to the United States Constitution, and because the Press Statement was explicitly in response to Plaintiffs comments, the School District is liable for an act of retaliation for her exercise of her First Amendment right.
The parties agree that "[t]o plead retaliation for the exercise of First Amendment rights, a plaintiff must allege '(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action.' " Mirabella v. Villard , 853 F.3d 641, 649 (3d Cir. 2017) (quoting Thomas, 463 F.3d at 296 ). The parties also agree that Plaintiff's status at the moment of the alleged retaliation was that of a private citizen, not a public employee. See Conard v. Pa. State Police, 902 F.3d 178, 182 (3d Cir. 2018) (after individual leaves public employment, public-employment first amendment framework does not apply).
The first element focuses on the conduct of the Plaintiff. The allegedly protected conduct pled here is Plaintiff's commentary *571 about the School District to various news outlets.[24] The second element focuses on the conduct of the Defendant. Because the alleged retaliatory conduct by the School District is in the form of the School District's own speech (i.e. official speech), the Court must first determine whether this speech can amount to a retaliatory act before it can determine whether it could be sufficient to deter a person of ordinary firmness from exercising her constitutional rights. Mirabella, 853 F.3d at 651 (when alleged act of retaliation is official's own speech, "we employ a more specific test to determine whether the official's speech amounts to a retaliatory act").
Official speech will only constitute a retaliatory act if it is of a "particularly virulent character." McLaughlin v. Watson, 271 F.3d 566, 573 (3d Cir. 2001). This is because a public "official," here the School District speaking via its Board and Solicitor, has its own First Amendment right countervailing to that of the Plaintiff. Conard, 902 F.3d at 183 ; see also Mun. Revenue Servs., Inc. v. McBlain, 347 F. App'x 817, 824 (3d Cir. 2009) (explaining that "other considerations are in play" when public official speaks on matters of public concern). Under this test, the Court "ask[s] whether there was 'a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow.' " Mirabella, 853 F.3d at 651 (quoting McLaughlin, 271 F.3d at 573 ).[25]
But there is an exception. The "virulent character" test only applies if the case involves a matter of public concern. Conard, 902 F.3d at 183. When "the official's conduct relates only to a private matter such as the plaintiff's job performance as a former employee," for example, the test does not apply. Id. Public policies supporting the "virulent character test," such as public interest in having officials fulfill their duties (which may require public criticism), are not in play when the speech concerns a private matter. In Conard, the retaliatory speech was in the form of false statements by a former public employer to a prospective employer in response to a reference request. Id. at 181. That was considered to be a private issue that had no public concern and did not warrant imposing a higher standard for the plaintiff's claim. Id. at 183.
Plaintiff argues that this case is just like Conard because the School District via the Press Statement was commenting on Plaintiff's job performance, so it concerns a private matter to which the "virulent character" test should not be applied. The School District, on the other hand, argues *572 that this is a matter of public concern because the comments were made at a school board meeting and involved matters of public interest, specifically responding to Plaintiff's earlier comments to news outlets about wrongdoing by the School District and its officials. The Court agrees with the School District.
Although statements made (by both sides) involve Plaintiff's time as Superintendent of the School District, the statements made by the School District are plainly matters of public concern because they were made in response to Plaintiff's very public allegations against the School District, including her allegations of the School District's official misconduct, wrongdoing, and financial waste. The fact that Plaintiff's job performance was also a major topic does not make the matter a private one in light of the fact that her service as Superintendent (a high public position in a school district) has become the subject of public debate and news coverage, orchestrated in the first instance by Plaintiff herself via her December 1, 2017, public statement accusing School District officials of nefarious conduct. "The interest of the public in hearing all sides of a public issue is hardly advanced by extending more protection to citizen-critics than to legislators." Bond v. Floyd, 385 U.S. 116, 136, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966). As the D.C. Circuit stated, "[i]f the First Amendment were thought to be violated any time a private citizen's speech or writings were criticized by a government official, those officials might be virtually immobilized." Penthouse Int'l, Ltd. v. Meese, 939 F.2d 1011, 1016 (D.C. Cir. 1991). On top of that, Plaintiff affirmatively pled that her speech was on matters of public concern (Compl. ¶ 42), and the Court has no trouble concluding that the District's response was part of that same transaction of public policy/conduct debates carried out via dueling press statements. Therefore, the Conard exception simply does not apply, and Plaintiff's claim for First Amendment retaliation is subject to the "virulent character" test.
The Eastern District of Pennsylvania recently applied the "virulent character" test to a motion to dismiss. In Noonan v. Kane , one plaintiff alleged that after he criticized former Pennsylvania Attorney General Kathleen Kane for her investigation into accusations of bribery of state assemblymen, Kane retaliated against him by suggesting that he was a racist. 305 F.Supp.3d 587, 601 (E.D. Pa. 2018). The district court dismissed that count, concluding that while Kane's response was "reprehensible" it did not allege a "threat, coercion, or intimidation" and could not rise to a claim of § 1983 retaliation. Id. In another count, however, allegations that Kane's subordinates threatened to harm the plaintiffs if they did not stop criticizing Kane's actions "crossed the line from protected First Amendment Speech by Kane to speech threatening harm," and that claim survived Kane's motion to dismiss. Id. at 602.
Applying the test to the facts pled here, the Court concludes that this claim fails. The Press Release does not threaten, coerce, or intimidate. It does not suggest that punishment, sanction, or adverse regulatory action will follow. Nor does the Complaint allege as much. The Plaintiff and the School District had settled their differences by resolving Plaintiff's first lawsuit. Plaintiff, by her own admission, then launched a public attack on the School District and its officials, their conduct, and their motives in parting ways with her. That then led directly to the public release of the Press Statement in response, in which the School District denied any such improper conduct, recited the School District's justifications for seeking to dismiss Plaintiff as Superintendent, *573 and set forth the School District's positions as to Plaintiff's discharge of her statutory duties as Superintendent.
In such specific circumstances, the rebuttal contained in the Press Statement is not retaliatory speech capable in these circumstances of supporting a First Amendment retaliation claim, as it makes no threat of future action and thus cannot meet the "virulent character" test. To hold otherwise on the facts pled here would, as the D.C. Circuit noted, immobilize public officials from responding to criticism and would truncate rather than foster the robust debate about governmental action contemplated by the First Amendment.
Therefore, Plaintiff fails to state a claim for First Amendment retaliation against the School District, and the Court's analysis stops here. In light of the content of the School District's Press Statement, the Court concludes that no further facts could be pled in an amended complaint that could save Count IV. Any amendment would therefore be futile, and this claim is dismissed with prejudice.
IV. Conclusion
For the foregoing reasons, the Motion to Dismiss filed by Defendants Michael Bartolini, Blairsville-Saltsburg School District, Linda Brown, Beverly Caranese, Holly Hall, Marlene Joyce, ECF No. 19, is granted on the terms set out in the accompanying Order. The Motion to Dismiss filed by Defendant John Cambest, ECF No. 21, is also granted on the terms set out in the accompanying Order.
Exhibit A
https://www.ndianagazette.com/news/details-of-blairsville-saltsburg-settlement-released/article_6d352af6-d6ae-11e7-bd9f-27a501a77d80.html
Details of Blairsville-Saltsburg settlement released
By MARGARET WEAVER mweaver@indianagazette.net Dec. 1, 2017 *574 The Blairsville-Saltsburg School District will pay $ 190,732.59 to Dr. Tammy Whitfield to settle a lawsuit regarding her suspension as the district's superintendent, according to the agreement.
Whitfield was suspended with pay Nov. 1, 2016, and was subsequently suspended without pay Dec. 7, 2016, on a vote of 5-4, with no reason ever publicly disclosed by the school board.
After her suspension, Whitfield filed a lawsuit against the district and the five board members who voted in favor of suspending her-Beverly Caranese, Holly Hall, Linda Brown, Marlene Joyce and Michael Bartolini - citing First Amendment retaliation and breach of contract and alleging the board violated a whistleblower law.
Whitfield had sought to be reinstated to her position, along with lost wages and interest; compensation for pain, suffering, emotional distress and humiliation; and attorney and legal fees and lost benefits.
On Nov. 15, the school board approved a general release agreement between the district and Whitfield, which was part of the settlement process.
*575 The settlement agreement was released Thursday by Whitfield. It does not contain a confidentiality agreement or non-disparagement clause.
Terms of the agreement include the following:
• The amount paid to Whitfield represents all wages and benefits owed through March 18, 2018. Two payments will be made: $ 95,366.59 within 30 days of the agreement and $ 95,366 on March 30, 2018.
• The district's insurer, CM Regent Insurance Company, will make a payment of $ 65,000 on behalf of district defendants (Caranese, Hall, Brown, Joyce and Bartolini) to Whitfield's counsel, Johnston Lykos LLC, for attorney fees. CM Regent will also pay all mediation fees incurred regarding the litigation.
• Whitfield is to be considered on personal leave of absence until March 31, after which she will be retired.
• All applicable Pennsylvania School Employees' Retirement System contributions for this time period will be made by the district.
• The district will pay COBRA premiums for Whitfield from April 1, 2018, to Dec. 31, 2018.
• The district will pay $ 1,449 in lieu of continuing to pay life insurance premiums on her behalf.
*576 • Her most recent performance evaluation will removed from the district's website.
• She will "discontinue and withdraw" the lawsuit against the five board members.
• In response to inquiries from potential employers, the district may only provide dates of Whitfield's employment, her position held and rate of pay.
• Whitfield will not apply for or seek employment with the district or its successors.
The document states that "this settlement agreement and release shall not be construed or interpreted as an admission of liability by the school district defendants."
It goes on to state that "neither party shall represent that they are the prevailing party."
District officials on Thursday declined to provide an estimate of how much the lawsuit has cost the district in total for items including attorneys' fees, fees for hearing officers and court reporters, cost of mediation and advertising for related meetings and for meeting cancellations.
A right-to-know request for related information was mailed Thursday after the information was denied via email by the district's solicitor, Krisha DiMascio.
Acting superintendent Jeff Soles and board president Caranese did not respond to an email request Thursday for a statement regarding the district's point of view on the settlement.
Whitfield's attorney, Nikki Velisaris Lykos, said in a statement that Whitfield "is pleased to have resolved her lawsuit so that she can put this situation behind her and focus on her future.
"That said," she continued, "it is unfortunate that Dr. Whitfield had to be crucified professionally by certain school board members simply because she spoke up about consolidation, which would benefit both the students and taxpayers of the district."
Prior to her suspension, Whitfield was placed on an "improvement plan" in June of 2016 following an evaluation. The five board members named in the lawsuit had all voted in favor of Whitfield's placement on the improvement plan.
The remaining four members of the board - Mary Whitfield, Anthony "Tim" Canzano, Molly Stiles and Rick Harper - came forward publicly to defend the superintendent after her placement on the plan and stated they believed she was the victim of a "witch hunt" and was unfairly being targeted over an attempt to consolidate the district's schools.
Of those members, Mary Whitfield, Canzano and Stiles voted against accepting the general release agreement on Nov. 15. Harper was absent.
Outgoing board member Mary Whitfield said Thursday they were kept in the dark.
"We voted no because we didn't know what we were voting on," she said. "We've not gotten one detail of the whole thing. We were not allowed into mediation. They gave us not one sentence out of the agreement."
"People in Blairsville need to understand we don't have a say on that board," she said. "The cost of all these investigations, that's money, as far as I'm concerned, taken right out of the kids' learning experiences. Everything they spend money on other than kids is hurting our kids. The money for education is so hard to come by. They make it so much worse by spending money on ... frivolous lawsuits."
*577 Whitfield had served as superintendent since April 2010, when she was hired to fill a position that had been occupied with interim officials for more than a year. Bringing two decades of education experience to the district, she previously worked in the Chartiers Valley School District for 22 years, including as assistant superintendent.
Following is a statement, in its entirety, released Thursday by Dr. Tammy Whitfield regarding the settlement of her lawsuit against the Blairsville-Saltsburg School District.
"No amount of money is able to erase the damage that 5 members of the Blairsville-Saltsburg School Board have caused. Beverly Caranese, Holly Hall, Marlene Joyce, Michael Bartolini, and Linda Brown voted repeatedly, following CONSOLIDATION presentations, to try to discredit me. As one of those school board members stated to a client(s), "We can't get rid of her since she hired an attorney, but we can make her life miserable until she quits." Another one of those board members showed up unannounced at a parent's house, encouraging the parent to sue the District/me, based on false allegations. The same board member and her attorney repeatedly contacted one of the investigators, threatened to sue, and demanded that the investigative report be changed since it did not say what she wanted it to say. Fortunately, the investigator had integrity and refused to change the facts. A third board member contacted the District Attorney on several occasions, stating that I should be brought up on Obstruction of Justice charges, even though her allegations were false. The District Attorney refused, as I had done nothing wrong. This type of treatment went on for over 2 years.
"However, after multiple, taxpayer-funded investigations, a phony evaluation which only included some board member comments, and statements from other administrators' evaluations and job descriptions, an agenda-driven improvement plan, a warrantless suspension for over a year, they were unable to find anything that would cause a dismissal. Each investigation proved that I had done nothing wrong. Additionally, it took them over a year, without pay, to schedule a 1080 Hearing, which they were trying to use to dismiss me. Interestingly, they didn't proceed, for I had done nothing that was fireable. They, instead, requested a settlement, most of which will be paid by your tax money.
"Also noteworthy is that the School Board had renewed my contract for 5 years, 10 months before it was due. Yet, a few months following the renewal, CONSOLIDATION was presented, and they viciously went after me. I have no doubt that they retaliated against me for over 2 years due to CONSOLIDATION. When the solicitor stated to several individuals, including me, that their actions were a "witch-hunt," their agenda was extremely transparent.
"It is unfortunate for the students and taxpayers of both communities to suffer at the hands of personal, agenda-driven board members. Conversely, Mary Whitfield, Molly Stiles, Tim Canzano, Rick Harper, and previous board member George Rowley tried to stop this injustice, but they did not have the majority. My hope is that the voting public will recognize and elect ethical, education-driven, community members in the future. Children's education and your tax money are at stake."
EXHIBIT B
December 5, 2017
PRESS STATEMENT
On or about December 1, 2017 the District was approached by news outlets to comment on a recent Settlement Agreement *578 between former Superintendent Dr. Tammy Whitfield and the District. Because of the personnel nature of the actions between Dr. Whitfield and the District the Board of School Directors felt it was inappropriate to make a comment at that time. However, after reviewing the December 1, 2017 reports from TribLive and the Indiana Gazette, the Board of School Directors thought it was appropriate to clear up the misstatements and fake news given to both the TribLive and the Indiana Gazette.
In April of 2010, the School District voted to approve a Contract between Dr. Whitfield and the District in spite of the fact that Whitfield had been engaged in termination proceedings and lawsuits with the Chartiers Valley School District in Allegheny County, Pennsylvania. Over the course of Whitfield's superintendency, she refused to communicate with Board Members and other Administrators on critical District matters, engaged in unethical behavior involving investigations surrounding family members, which unprofessional conduct caused her to be placed on a Performance Plan by the Board of School Directors. During the Performance Improvement Plan it was discovered that Whitfield had violated not only District Policy but also provisions of the Pennsylvania School Code which resulted in her being placed on leave without pay pending an investigation. Whitfield chose not to participate in the Due Process Hearings to defend or explain her actions leaving the Board of School Directors no choice but to suspend her without pay pending a Section 1080 Disciplinary Hearing under the Pennsylvania School Code.
Some of the allegations lodged against Whitfield in regard to the Section 1080 Hearing were as follows:
1. Dr. Whitfield filed a lawsuit against a family without Board approval in violation of the Pennsylvania School Code;
2. Dr. Whitfield unilaterally transferred teachers without Board approval in violation of District Policy, the Teachers Contract and her own Contract. It was often reported to the Board that this was done as a form of control and retaliation/favoritism of professional teachers;
3. Dr. Whitfield participated in and conducted an investigation involving a family member on two (2) separate occasions. The actions of Dr. Whitfield were unethical especially after being warned the first time in regard to a similar incident;
4. It was discovered that student expulsion procedures were violated in accordance with the Pennsylvania School Code and District Policies;
5. Dr. Whitfield broke confidentiality of students and violated her own Contract by speaking out about internal investigations prior to their being accepted by the Board;
6. The District lost two (2) students in a short period of time and as the District and community were coming together to mourn the Superintendent went to an education conference. It was later discovered that Whitfield chose not to stay in the District but instead to attend the conference in an attempt to influence the person conducting a separation report of the Blairsville-Saltsburg School District. This was reported to the Board of School Directors by the individual conducting the separation report;
7. Whitfield conducted over ninety-five (95) Loudermill Disciplinary *579 hearings in five (5) years. The Superintendent was given no authority to conduct many of these hearings. The Board received many complaints by staff and professional employees that Whitfield used these Hearings to threaten jobs and flex her power within the District one case cost the District in excess of $ 200,000 in back pay and legal and arbitration fees;
8. During her superintendency, Whitfield failed to properly supervise the employees in her Administration and often took time off without notifying the Board or leaving proper Administrators in charge of the District;
9. During her superintendency, Whitfield unilaterally and without Board approval hired Professional Employees on incorrect salary steps in violation of District Policy with a financial liability to the District of Fifty Thousand ($ 50,000.00) Dollars;
10. During her superintendency, Whitfield allowed overtime pay to be withheld for certain employees in an attempt to circumvent State Law. This had a liability to the District of approximately Thirty Thousand ($ 30,000.00) Dollars;
11. During her superintendency, Whitfield allowed pay advancements for employees on leave that were not approved by the Board which required the District to recover funds of approximately Fifteen Thousand ($ 15,000.00) Dollars that were improperly spent. The District may have additional liability to the District that is unaware of.
The issue of consolidation was never raised in Whitfield's Improvement Plan or Notice of Charges for the Section 1080 Hearing.
It was after these allegations were made known to Whitfield that she filed a frivolous Federal lawsuit against the District and five (5) Board Members citing consolidation as the main issue for potential disciplinary action. After the District noticed the Section 1080 Disciplinary Hearing, and after being faced with the multiple charges against her, the District began receiving offers to settle from Dr. Whitfield's attorneys but were unable to come to an agreement. The Section 1080 Hearing was continued and the District came to a final Settlement Agreement as a result of mediation between the parties.
The District believes that its action to settle the termination proceedings was in the best interest of providing professional leadership and quality educational programs for the District's students. As a result of actions being taken by the Board of School Directors, the Board of School Directors believes that the settlement of the termination proceedings involving Dr. Whitfield will result in an approximate savings of $ 500,000 on the remainder of Dr. Whitfield's contract alone and an estimated $ 100,000 in legal fees for both the 1080 hearing and federal lawsuit which far outweigh the cost of termination of Whitfield and future liabilities to the District both educationally and economically.
The Board of School Directors looks forward to putting this inauspicious chapter behind them and to moving forward with quality professional leadership for the District. The District would like to commend its current Administration for taking on *580 additional roles and responsibilities during this unpleasant time.

Plaintiff was formerly known as Tammy Whitfield. (Compl. ¶ 1.)

Notably, although the later "Press Statement" (from which Plaintiff's claim arise) was made on behalf of the School District as a whole, Plaintiff has only sued those members of the School Board who had (previously) voted to suspend her back in December 2016.

Plaintiff did not attach a copy of the Indiana Gazette news article containing extensive quotes from her own publicly released "statement" regarding the settlement. That article, and its verbatim recitation of Plaintiff's public statement was publicly known, including to the School Board, when it responded with its Press Statement, which Plaintiff did attach to her Complaint. (ECF No. 1-2 ). Further, in light of the fact that Plaintiff specifically cited to and relied on her own "statement" in her Complaint (Compl. ¶ 16), it is perfectly appropriate for the Court to consider it here under the long-standing principle that extrinsic matters become intrinsic when a plaintiff references them (but fails to attach them) as part of her claim. Hartig Drug Co. v. Senju Pharm. Co. , 836 F.3d 261, 268 (3d Cir. 2016). The Indiana Gazette article, dated December 1, 2017, at issue is attached to this Opinion as Exhibit A.

Plaintiff attached a copy of the School District's Press Statement to her Complaint as Exhibit A. (ECF No. 1-2.) It is also attached to this Opinion as Exhibit B.

Referencing Section 1080 of the School Code of 1949, as amended. 24 P.S. § 10-1080 (West 2012).

The two individual defendants in Ferrone held the positions of Chief Executive of Allegheny County and Director of the Department of Economic Development of Allegheny County. 439 F.Supp.2d at 445.

Plaintiff also cites to Gilbert v. Feld, 788 F.Supp. 854, 861 (E.D. Pa. 1992), for its statement that "unless plaintiff admits, in the complaint, that defendant is entitled to qualified immunity, such defense cannot be used to defeat the claim at this preliminary stage." Plaintiff takes this language too literally, as two sentences earlier the Court stated the standard: "[t]he defense of qualified immunity can support the grant of a Rule 12(b)(6) motion only when the complaint itself establishes the circumstances required for a finding of qualified immunity." Id. (emphasis added).

The Zurchin Court did not dismiss claims against the school board members in their individual capacities based on the second prong of the high public official immunity test because the complaint sufficiently alleged that some conduct alleged occurred outside the scope of their official duties in connection with school district business. Zurchin, 300 F.Supp.3d at 695.

The Wagner Court ultimately denied the motion to dismiss, concluding that "the defense of official immunity does not apply to any act by a high public official that constitutes a crime, actual fraud, actual malice or willful misconduct," citing 42 P.S. § 8550, but, of course, our Court of Appeals and the Pennsylvania Supreme Court have explicitly stated that the Pennsylvania Political Subdivision Tort Claims Act did not abrogate the high public official immunity doctrine. Wagner , 2005 WL 2319141, at *8-9, 2005 U.S. Dist. LEXIS 45663, at *24 ; Heller, 454 F.3d at 178 n.2 ; Lindner, 677 A.2d at 1196 ("[O]ur courts have agreed that Section 8550 of the [Tort Claims Act] does not abrogate the common law doctrine of absolute privilege for high public officials.").

Pursuant to the School Code, the only statutory duties of the President are the signing of official legal documents (such as checks and deeds) only after being authorized by the Board to do so and the calling of special meetings. 24 Pa. Stat. and Cons. Stat. Ann. § 4-426 (2019). Those duties have no relevance here.

For her argument that School Board Members Defendants are not high public officials, Plaintiff relies largely on cases addressing other positions within and outside the school system. See Kobrick v. Stevens, No. 13-cv-2865, 2014 WL 4914186, at *14-15, 2014 U.S. Dist. LEXIS 137554, at *35 (M.D. Pa. Sep. 30, 2014) (concluding on motion to dismiss that teachers and principals do not qualify as high public officials); Ferrone, 439 F.Supp.2d at 455 (concluding the record on motion to dismiss was not sufficiently developed to determine whether Chief Executive of Allegheny County and Director of the Department of Economic Development of Allegheny County were entitled to high public official immunity). Plaintiff cited to Wagner for its holding that teachers and principals do not qualify as high public officials, ignoring its holding that school board members do qualify. 2005 WL 2319141, at *8-9, 2005 U.S. Dist. LEXIS 45663, at *24. The Court is also not persuaded by Plaintiff's citation to Keeler v. Everett Area School District, which does not reference or discuss the high public official doctrine. 111 Pa.Cmwlth. 297, 533 A.2d 836, 837 (1987).

Lindner explains,
[I]t has been found to be in the public interest and therefore sounder and wiser public policy to 'immunize' public officials, for to permit slander, or libel suits where the official's charges turn out to be false, would be to deter all but the most courageous or the most judgment-proof public officials from performing their official duties.
677 A.2d at 1196 (quoting Matson v. Margiotti, 371 Pa. 188, 88 A.2d 892, 899-900 (1952) ).

The Court concludes that the School Board Member Defendants have absolute immunity under the high public official immunity doctrine, so the Court need not analyze whether they also possess immunity under the Pennsylvania Subdivision Tort Claims Act, 42 Pa. C.S. § 8541.

"Rather than conferring any substantive rights, section 1983 'provides a method for vindicating federal rights elsewhere conferred.' " Hildebrand v. Allegheny County, 757 F.3d 99, 104 (3d Cir. 2014) (quoting Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) ).

In order to show damage, or "stigma" to one's reputation, "it must be alleged that the purportedly stigmatizing statements(s) (1) were made publicly and (2) were false." Dee, 549 F.3d at 235. There is no dispute that the Press Statement constitutes a publicly made statement. Although Defendant Cambest disputes Plaintiff's characterization of statements in the Press Statement, he does not argue that Plaintiff has failed to plead falsity. However, the Court largely agrees with Defendant Cambest that most (but not all) of the allegedly false statements in the Press Statement are simply re-hashed allegations previously lodged against Plaintiff and not newly issued allegations. Plaintiff does not plead that the lodged allegations were never actually lodged, only that the underlying allegations are meritless. "[I]f her own exhibits contradict her allegations in the complaint, the exhibits control." Vorchheimer v. Philadelphian Owners Ass'n, 903 F.3d 100, 112 (3d Cir. 2018).

Plaintiff does not allege that the loss of her formerly held job as Superintendent of the School District is a deprivation of a liberty/property interest. Nor could she because the end of her employment occurred prior to when the allegedly defamatory statements (i.e. the Press Statement) were made. Rather, Plaintiff alleges that she has been deprived of "opportunities for obtaining employment in her chosen occupation as a school Superintendent." (Br. in Opp'n, ECF No. 26, at 8.)

Plaintiff asserts that Clark did not hold, as a general rule, that the possible loss of future employment opportunities is an insufficient "plus" deprivation. However, to quote Clark, "[t]he possible loss of future employment opportunities is patently insufficient to satisfy the requirement imposed by Paul that a liberty interest requires more than mere injury to reputation." Clark, 890 F.2d at 620. Burns v. Alexander, cited by Plaintiff, does not compel a different conclusion, as that opinion addressed state-issued licenses and clearances that are essential to pursuing an occupation. 776 F.Supp.2d 57, 81 (W.D. Pa. 2011). Furthermore, the plaintiff in Burns demonstrated more than "negative implications" for future employment prospects, including "tangible injuries such as her temporary removal from [the child care center she ran], the decision not to renew her operating license, [the center's] suspension from the Keystone STARS program, and her loss of over $ 30,000.00 in grant money and tuition support." Id. at 83. Plaintiff also relies on an older case from our Court of Appeals that vacated a district court's grant of a motion to dismiss based on the pre- Iqbal / Twombly pleading standards where the plaintiff alleged that he was defamed in the course of being discharged, which is not the case here. McKnight v. Se. Pa. Transp. Auth., 583 F.2d 1229, 1236 (3d Cir. 1978) ; see also Hill v. Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006) (where employer disseminates defamatory impression about employee in connection with termination, the defamation is the stigma and the termination is the plus). See note 16 supra. Hill does not apply in that way here, since the Press Statement came after Plaintiff's employment ended.

To be clear, an inquiry into the sufficiency of a due process claim such as the one brought by Plaintiff does not end with the "stigma-plus" test. "Once it is determined that the Due Process Clause is implicated by a specific deprivation of liberty or property, the relevant question becomes 'what process is due' under the particular circumstances." Whittaker v. County of Lawrence, 674 F.Supp.2d 668, 694 (W.D. Pa. 2009) (quoting Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ). Because Plaintiff's claim does not survive the "stigma-plus" test and the Individual Defendants did not address the second part of the procedural due process claim analysis, the Court need not address that part of the analysis at this time.

Plaintiff's Complaint does not set forth allegations to support a claim for a violation of substantive due process, as it fails to plead allegations that the Individual Defendants' behavior(s) shocked the conscience. However, the Court will nevertheless address Plaintiff's argument in her brief that the pled liberty interest-the ability to obtain employment-"should be considered a deprivation of a liberty interest afforded substantive due process protection." (ECF No. 126, at 10.) Plaintiff did not argue that stigma to her reputation alone could constitute a deprivation of a liberty afforded substantive due process protection.

The plaintiff in Hart filed an amended complaint in which he alleged that "he applied for four positions following his termination but was not hired due to the defamatory and stigmatizing accusations of theft and racism." Hart v. W. Mifflin Area Sch. Dist. , No. 16-cv-1066, 2017 WL 1282623 at *5, 2017 U.S. Dist. LEXIS 52638 at *12 (W.D. Pa. Apr. 6, 2017). Upon review of the added allegations, this Court concluded that "[p]laintiff has done more than allege a generalized 'possible loss of future employment opportunities.' " Id. (citing Simpson, 500 Fed. Appx. at 188 ).

If Plaintiff elects to amend, she must specify in her amended complaint whether Count II is intended to be brought under the Fourteenth Amendment's substantive due process doctrine, the procedural due process doctrine, or both, and provide a factual basis that makes such claim(s) plausible. Furthermore, Plaintiff must plead facts demonstrating the specific personal involvement of each Individual Defendant as to any Constitutional deprivations she alleges. Group pleading as to such matters will not suffice. See Krebs v. New Kensington-Arnold Sch. Dist. , No. 16-cv-610, 2016 WL 6820402, at *8, 2016 U.S. Dist. LEXIS 159059, at *21-22 (W.D. Pa. Nov. 16, 2016) ("Without separately alleging the conduct of each Defendant, Defendants are not on notice of their conduct.") (citing Estate of Smith v. Marasco, 430 F.3d 140, 151 (3d Cir. 2005) ); Best Med. Int'l, Inc. v. Accuray, Inc. , No. 10-cv-1043, 2011 WL 860423, at *6, 2011 U.S. Dist. LEXIS 23571, at *16 (W.D. Pa. Mar. 9, 2011) (Plaintiff failed "to plead any facts which reflect the actual conduct in which any Individual Defendant engaged. Rather, the Amended Complaint contains only generic, conclusory references to all of the Individual Defendants as a group.").

Plaintiff's pled statements under Count III, such as "[t]he District, acting through its agents and/or employees" (Compl. ¶ 34), are likely too conclusory to state a claim on the basis that "[a]n individual's conduct implements official policy or practice." Hill, 455 F.3d at 245. These are simply dressed-up respondeat superior allegations, and they do not make the cut under Hill or Monell.

Plaintiff's commentary in her response brief that her adversaries' legal arguments are "nonsensical," constitute "feigned ignorance ... border[ing] on the absurd," and "belie[ ] a fundamental misunderstanding of" legal principles are not helpful to the Court in its disposition of the pending Motions to Dismiss. Plaintiff's counsel is instructed to knock it off.

The School District argues that because Plaintiff failed to identify the statement that she gave to news outlets, her Complaint fails to satisfy the first element. Plaintiff alleges that she gave a "statement concern[ing] false allegations, wrongdoing, misconduct, and financial waste by The District and the School Board Defendants." (Compl. ¶ 42.) When read together with the preceding paragraph, it is clear that this statement is the same December 1, 2017, statement referenced in the Press Statement. Therefore, the "constitutionally protected conduct" is properly identified.

In McLaughlin, our Court of Appeals adopted the heightened "virulent character" standard from the Fourth Circuit's decision in Suarez Corp. Indus. v. McGraw, 202 F.3d 676 (4th Cir. 2000) :
When a public official is sued for allegedly causing a third party to take some type of adverse action against plaintiff's speech, we have held that defendant's conduct must be of a particularly virulent character. It is not enough that defendant speaks critically of plaintiff or even that defendant directly urges or influences the third party to take adverse action. Rather, defendant must "threaten" or "coerce" the third party to act.
McLaughlin, 271 F.3d at 573.